Nathan M. Olsen, ISB No. 7373
Steven L. Taggart, ISB No. 8551
**OLSEN TAGGART PLLC**
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 552-6442
Facsimile: (208) 524-6095
Email: nolsen@olsentaggart.com
Email: staggart@olsenstaggart.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HAROLD L. RUPP SR. TRUST, an Idaho trust; and VEDA J. RUPP REVOCABLE LIVING TRUST, an Idaho trust, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF POCATELLO, an Idaho municipality; MILLENNIAL DEVELOPMENT PARTNERS, LLC, a Utah limited liability company; PORTNEUF DEVELOPMENT, LLC, an Idaho limited liability company; PORTNEUF BUILDERS, LLC, an Idaho limited liability company; BRIAN BLAD, in both his official and individual capacities; KEN PAPE, individually; ARVIL B. SWANEY, individually; and JOHN OR JANE DOES 1-10, <br><br> Defendants. | Case No. _____ <br><br><br><br> **COMPLAINT FOR DECLARATORY AND MONETARY JUDGMENT** |

COMES NOW Plaintiffs Harold L. Rupp Sr. Trust and the Veda J. Rupp

Revocable Living Trust (hereafter "Rupp Trusts" or "Plaintiffs"), by and through

counsel, and complain against Defendants as follows:

## PARTIES

1.      The Rupp Trusts are the owners of approximately 930 acres located east of the Northgate Interchange off I-15.  Such land is now located in the City of Chubbuck, Idaho.

2.      Defendant City of Pocatello (hereafter "Pocatello") is an Idaho municipal corporation.

3.      Defendant Millennial Development Partners (hereafter "Millennial"), is an expired Utah limited liability company and a foreign entity in Idaho that has been administratively dissolved by the Idaho Secretary of State. It purchased land from the Rupp Trusts that is the subject of this action.

4.      Defendants Portneuf Development, LLC, and Portneuf Builders, LLC are Idaho limited liability companies whose place of business and primary manager is Ken Pape.  These entities may be hereafter referred to collectively as ("Portneuf Development").

5.      Defendant Brian Blad (hereafter "Blad") is the Mayor of Pocatello and is also an individual located in the City of Pocatello.

6.      Defendant Ken Pape is an individual and resident of the Pocatello area.

7.      Defendant Arvil B. Swaney is an individual and believed to be a resident of Murray, Utah.

8.      Jane and/or John Does are presently unknown parties residing at unknown locations who have harmed Plaintiff in connection with the matters of this Complaint.

9.      The various Defendants have acted as agents for each other in connection with the matters contained in this Complaint.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to:

      a.   Fifth Amendment to the U.S. Constitution pursuant to 28 U.S.C. § 1331;

      b.   42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and/or 1334(a)(3);

      c.   Civil conspiracy pursuant to 28 U.S.C. § 1367; and

      d.   Lanham Act pursuant to 28 U.S.C. § 1331.

11.    This Court has personal jurisdiction over the parties in this matter by F.R.C.P. 4(k)(1)(a).

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and Dist. Idaho Loc. Civ. R. 3.1.

## ALLEGATIONS COMMON TO ALL COUNTS

13.    Rupp Trusts own 930 acres of agricultural land located to the east of the Northgate Interchange I-15, south of Fort Hall and generally north of the bulk of Pocatello and east of the bulk of the City of Chubbuck (hereafter "Chubbuck"). This land is hereafter referred to collectively as the "Rupp Trust Property".

14.    The following is an image from the Bannock County Parcel Viewer showing the location of the Rupp Trust Property:



The Rupp Trust Property is the portion of the map shaded olive green (the lighter lower portion is inside Chubbuck and upper portion is located in Bannock County) consisting of four pivots and additional ground.

15.     The Rupp Trust Property has its origins when Henry Jensen and his family arrived in 1923 and developed the land as a farm.

16.     Since 1923, the farm has been passed down through the family generations, and is now preserved in the Rupp Trusts, which currently have six living original beneficiaries and 95 living contingent beneficiaries – most of whom reside in Eastern Idaho.

17.     The Rupp Trust Property contains one large irrigation well and other large water sources with associated water rights, of both significant quantity and quality, and valuable priority dates.

18.     Pocatello's Comprehensive Plan dated March 5, 2015, states that one of the City's goals is to: "Support the acquisition and development of alternative and/or additional water sources for the cities of Pocatello and Chubbuck." Source: https://www.pocatello.us/DocumentCenter/View/376/Comprehensive-Plan-2015-Update-PDF

19.     For some time, Pocatello has discussed and explored obtaining access to the large water resources associated with the Rupp Trust Property.

20.     As Pocatello has grown northward and Chubbuck has expanded to the east, in 2017, the Idaho Department of Transportation (hereafter "ITD"), prodded by local officials and local interests, approved the construction of the Northgate Interchange.

21.     The Rupp Trust Property is the only property immediately on the east of the Northgate Interchange.

22.     Construction of the Northgate Interchange began in 2018 and roughly $31 million in taxpayer dollars has been devoted to the project, both for the highway on and off ramps, an overpass over I-15, and associated road construction.

23.     Access to the east side of the Northgate Interchange required the construction of a new road now known as Northgate Parkway, which extended east into the Rupp Trust Property.

24.     On April 16, 2017, after negotiations, the Rupp Trusts and Millennial entered into a Right-of-Way Purchase and Sale Agreement (hereafter "Sale Agreement"). A true and correct copy is attached as Exhibit "A".

25.     In Paragraph 15 of the Sale Agreement Millennial committed to provide the Rupp Trust:

15.     ADDITIONAL BUYER COMMITMENTS.

a.      Buyer shall provide, at no expense to seller, sewer and water utility line stubs at 3 locations on the north side of the ROW on the Rupp Property. The first utility stub shall be located at the Olympus Road connection, with two additional water and sewer utility line stubs located east of the Olympus Road connection at approximate equal intervals, as Seller is making no infrastructure investment west of the extension of Olympus Road.

b.      Buyer acknowledges that a separate agreement is being developed between Seller and Portneuf Development, LLC, the City of Pocatello and/or Bannock County for placement of an additional Intersection with water and sewer line stubs. This future Intersection shall be located approximately 1400 feet east of the current Interstate ROW. Under this separate conceptual agreement, an additional sewer line would be installed parallel to the Interstate on the east ROW, with a sewer stub located on both the north and south sides of the new interchange, and with the sewer line continuing south to a sewer lift station, for future development on the Rupp property. This Intersection, water and sewer stubs and sewer line shall be done at no costs to the Rupp's. Buyer is agreeable to this conceptual intersection, and will accommodate its convenient future construction within the roadway designs.

26.     Importantly, Paragraph 15(a) explicitly commits Millennial  to build an Olympic Road connection and three sets of utility stubs (consisting of sewer and water) which would provide both access and utilities to the Northgate Parkway for the Rupp Trust Property at no expense to the Rupp Trusts.

27.     In addition, Paragraph 15(b) specifies that, at no cost to the Rupp Trusts, another intersection and utility connections will be located for the benefit of the Rupp Trust Property approximately 1,400 feet east of the land constituting the ITD Interchange right-of-way.

28.     On August 14, 2017, ITD, Bannock County, Pocatello, Chubbuck, Pocatello Development Authority, Millennial  and Portneuf Development entered into a

Construction Cooperative Agreement, a true and correct copy of which is attached as Exhibit "B", wherein Pocatello covenanted to:

> 3.2.4   The City of Pocatello shall accept full control and jurisdiction of the right-of-way, newly constructed roads, and associated facilities for connections within Pocatello. This will include the road from the Interchange to Olympus Drive (unless otherwise within ITD's jurisdiction and control for all such properties/roads).

Exhibit "B", pg. 8.

29.     On September 27, 2017, the Rupp Trusts, pursuant to the Sale Agreement, deeded the property specified for the Interchange and the Northgate Parkway to Millennial. The applicable deed is attached hereto as Exhibit "C" and shows that the Northgate Parkway portion was 150' wide. That property shall be henceforth known as the "Northgate Parkway Property".

30.     Millennial then transferred the Northgate Parkway Property (plus other parcels of land) to Town Center JV, a general partnership of Millennial and Portneuf Development, through a Warranty Deed dated October 2, 2017, and recorded October 12, 2017, as Instrument No. 21715051. A true and correct copy is attached as Exhibit "D".

31.     During the planning and approval stages of the interchange, which involved ITD, Pocatello City Engineer – Merrill Quail -- Millennial, Portneuf Development and the Rupp Trusts, a road design was submitted by Millennial and approved by ITD. This design dated March 5, 2018 (attached as Exhibit "E"), specifically included an access point from the Northgate Parkway to the Rupp Trust Property. *Id.*

32.     On May 30, 2018, when the Rupp Trusts expressed concern about Millennial's compliance with the Sale Agreement, Millennial's attorney wrote the Trustee of the Rupp Trust that:

> . . . Buyer is willing to commit to provide a total of three access points along **Seller's** future Northgate Parkway frontage. <u>The first of these will be placed approximately 1400' east of the Interchange, as already designed and approved in the Olympus/Northgate road engineering documents</u>.

Patrick J. Davis letter, dated May 30, 2018 (a copy is attached as Exhibit "F").

33.     In exploring their options, the Rupp Trusts considered annexation by Pocatello but discovered that such would require expenditure of approximately $4-5 million for a sewer lift station and other supporting infrastructure in order to obtain Pocatello utilities.

34.     In contrast, Chubbuck offered to annex the Rupp Trust Properties and provide utility access for less than $500,000.

35.     After considering their options, on December 19, 2018, the Rupp Trusts signed an Annexation Agreement with Chubbuck, and thereafter, over 300 acres of the Rupp Trust Property were annexed into Chubbuck.

36.     On learning that the Rupp Trust Property was being annexed into Chubbuck, Blad called Mayor Kevin England of Chubbuck and threatened to discontinue sewer service provided by Pocatello to Chubbuck unless the decision was reversed.

37.     After the Rupp Trust property was annexed by Chubbuck, Blad and other Pocatello City employees expressed their displeasure and hostility towards the Rupp Trusts both publicly and privately.

38.     Sometime shortly after Chubbuck's annexation of the Rupp Trust Property, Blad, defendants Pape, Swaney, and other John and Jane Does, individually and through their entities  (hereinafter referred collectively referred to as "Conspirators") hatched and executed a scheme to isolate the Rupp Trusts from economic benefits related to the Northgate Interchange, with a joint purpose of severely devaluing the Rupp Trust Property and to effectively extort the Rupp Trusts into selling the property, including its highly sought after water rights for a fraction of the property's value.  The Conspirators would mutually benefit by such a scheme, in that the individual and business entity Defendants would obtain extremely valuable developmental property, to which they could reannex the property into the City of Pocatello along with the water rights critical both to Pocatello's comprehensive plan and the business interests of the other Defendants (some of which likely include business interests of Pocatello officials and employees). Such conduct demonstrating or revealing this scheme includes but is not limited to the following:

a.   Immediately after Chubbuck annexed the Rupp Trusts Property, the Rupp Trusts' trustees were cut out of all discussions, decisions, and communications regarding the development in and around the Northgate Interchange area.

b.   On several occasions, the Rupp Trusts members were told directly and indirectly that their water rights would be brought into the City of Pocatello whether they wanted it or not.

c.   The Conspirators heavily promoted the development of the Northgate Interchange area. The Conspirators met with potential investors and

developers on several occasions. The Conspirators falsely informed the potential investors and developers that the trustees of the Rupp Trusts were not interested in developing the Rupp Trust Property because "they (the Rupps) didn't want to sell the property, but wanted to keep farming." The Conspirators also made disparaging and derogatory remarks to third parties about  the Rupp Trusts' trustees and discouraged, or otherwise interfered with, investors and developers from meeting with, and directly contacting, the Rupp Trusts' trustees.

d.   In meetings and communications with "interested parties" concerning the Northgate Interchange development to which the Rupp Trusts were excluded, Conspirators spread misinformation as to Rupp Trusts' intentions, rights, and agreements pertaining to the property.

e.   Blad and other Pocatello officials conducted numerous meetings, conversations, and communications with the Conspirators outside of the public purview and/or in violation of public meetings laws.

f.   In violation of its contract, Millennial constructed the Northgate Parkway without including the promised access points and additionally placed barriers preventing the Rupp Trusts from building their own access points. Attempts by the Rupp Trusts to compel Millennial to abide by its contract were rebuffed or ignored.

g.   Maps of the project that showed the intended width of the road and the access points to the Rupp Trust Property were scrubbed from Pocatello records and removed from its website.

h. The Conspirators devised a plan to permanently cut off access to the Rupp Trust Property through a highly deceptive annexation process that included maps and other materials presented to the City Council and public that obscured their intentions, adding or modifying materials in record well after the fact, and other such deceptive tactics.

i. Deeding the Northgate Parkway Property back and forth between several entities and then dissolving the previous entities in an attempt to disguise the Conspirators' actions.

39.     On November 13, 2019, Town Center JV was terminated through a Statement of Dissolution (Partnership) filed with the Idaho Secretary of State. A true and correct copy of that document is attached as Exhibit "G".

40.     That Statement of Dissolution (Partnership) states under Paragraph 4:

| 4. Effective Date | |
| The dissolution shall be effective | when filed with the Secretary of State. |

41.     Under Idaho Code § 30-23-802, a dissolved partnership's authority is limited:

30-23-802.  WINDING UP. (a) A dissolved partnership shall wind up its business and, except as otherwise provided in section 30-23-803, Idaho Code, the partnership continues after dissolution only for the purpose of winding up.
(b)  In winding up its business, the partnership:
(1) Shall discharge the partnership's debts, obligations, and other liabilities, settle and close the partnership's business, and marshal and distribute the assets of the partnership; and
(2)  May:
(A)  Deliver to the secretary of state for filing a statement of dissolution stating the name of the partnership and that the partnership is dissolved;
(B)  Preserve the partnership business and property as a going concern for a reasonable time;
(C)  Prosecute and defend actions and proceedings, whether civil, criminal or administrative;

(D)  Transfer the partnership's property;
(E)  Settle disputes by mediation or arbitration;
(F)  Deliver to the secretary of state for filing a statement of termination stating the name of the partnership and that the partnership is terminated; and
(G)  Perform other acts necessary or appropriate to the winding up.

42.     Despite being dissolved and limited to winding up its activities, Town Center JV requested the Northgate Parkway Property be annexed into the City of Pocatello on November 18, 2019.  See attached Request for Annexation and Zoning Application, Exhibit "H."

43.     Said request claimed as its justification in a Written Justification – Northgate Parkway Annexation dated November 20, 2019, that:

> The proposed Zoning of Commercial use would be in the community's best interest because the surrounding parcels adjoining the area of Annexation, West of the Round-a-bout at Olympus Drive, will likely be zoned commercial with the new connection of the Interstate Interchange.

> Exhibit "I", pg. 1.

44.     Of note, the surrounding parcels were and are located in the City of Chubbuck, not Pocatello.

45.     On October 31, 2019, Jared Johnson, Pocatello City Attorney, prepared a memo for Mayor Blad and the City Council which advised the City to accept the right-of-way for the Northgate Parkway.

46.     However, the memo never fully disclosed that the Northgate Parkway Property was surrounded by Chubbuck and that the proposed portion being deeded to Pocatello would have 10' feet control strips on both sides, held by the Town Center JV. *See* Exhibit "J".  In fact, none of the documents, plans and presentations to the public or the Pocatello P&Z and Council mentioned the 10' feet control strips.

47.     Such control strips violate Pocatello Ordinance 16.20.050(D), which specifies for Pocatello subdivisions "[t]he use of a "Control Strip" intended to control or prevent the future extension of public facilities or development of adjacent land is prohibited."

48.     The Pocatello City Council approved acceptance of the right-of-way in late 2019.

49.     On December 6, 2019, Town Center JV, Millennial and Portneuf Development deeded to Pocatello the center 130' of the Northgate Parkway Property. *See* attached Exhibit "K."  This 130' strip does not include the full 150' strip that the Conspirators had represented to both the ITD and the Rupp Trusts as the Northgate Parkway.

50.     The Conspirators then expeditiously moved forward on the annexation. The documents prepared by Pocatello officials, in concert with the Conspirators, presented an annexation map to both the City's Planning & Zoning Commission and the City Council that does not show the 10-foot strips on either side of the Northgate Parkway, which was to be annexed into Pocatello. See attached Exhibit "L."

51.     On March 5, 2020, the City Council of Pocatello approved the annexation proposed by Town Center JV and zoned the property Commercial General. The attached map shows the annexed property.  The Ordinance and its attached map, as recorded in the county records as Instrument #22004098 *does not* show the 10-foot strips. *See* Exhibit "M".

52.     On May 1, 2020, Town Center JV, despite being dissolved, deeded a 10' strip on the northern edge of the Northgate Parkway property *back to* Millennial (now

dissolved) and Portneuf Builders, LLC. Such is reflected in Exhibit "N". This was the *fait accompli* act of the Conspirators that legally blocked the Rupp Trusts from accessing the Northgate Parkway Property that is necessary for the development of the Rupp Trust Property.

53.     The Rupp Trusts has had four separate *bona fide* offers to purchase property from the Rupp Family Trust at up to $10 per square foot, or $465,000 per acre (depending on location), from developers or investors. Proposals have included projects ranging from large retail malls, manufacturing facilities, office buildings and residential developments. All of these offers could not be accepted due to the lack of access and development rights. It is believed that these prospective buyers have moved their projects elsewhere

54.     Rupp Trusts have also received substantial interest from seventeen other prospective purchases, i.e. for a hotel, fuel station, truck facility, parking facility, apartment complex, senior living, auto dealership, and several affordable housing developers. Again, none of these potential deals can be pursued, due to the access and development restrictions.

55.     The Rupp Trusts' fair market value of its property with full access and development rights, and taking into consideration right-of-ways and potential public spaces, prior to the defendants' actions cutting of access, was at least $22,000,000.

56.     Some of the Conspirators have approached the Rupp Trusts, offering only $500 per acre for the property, totaling $190,000.

57.     The diminished value of the Rupp Trust Property resulting from defendants' actions is no less than $21,210,000.

## COUNT I: REGULATORY TAKING
### (Against City of Pocatello)

58.     Plaintiffs realleges the allegations set forth above in the Complaint as if set

forth below.

59.     The Fifth Amendment to the United States Constitution specifies:

 No person shall . . be deprived of life, liberty, or property, without due
 process of law; nor shall private property be taken for public use, without
 just compensation.

60.     Under U.S.C. 42 § 1983, a person who is deprived of rights under the

color of any act, statute, ordinance, regulation, custom or usage of any public entity is

entitled to redress at law or in equity

61.     The following shows the area annexed into Pocatello in relationship to the

boundaries of Chubbuck:



The portion colored blue/purple is Pocatello and the pink portion is Chubbuck.  A

comparison with Exhibit "M" shows that Pocatello annexed land that intrudes into the

City of Chubbuck, but only over Northgate Parkway itself.

62.     Pocatello Ordinance 17.02.110 sets forth the standards for Pocatello to annex land:

17.02.110: ANNEXATIONS:

The corporate boundary of the city may be expanded whenever the council deems it to be for the public convenience or necessity or for the general welfare. Annexations shall be conducted in accordance with Idaho state code title 50, chapter 2. As land is annexed it shall be given a comprehensive plan and zoning district designation based on the provisions of section 17.01.130, in the plan designation-zoning district conversion chart, of this title and the review criteria listed in subsection 17.02.170E of this chapter . . . .

(emphasis added)

63.     Idaho Code § 50-222(2) provides the following legal requirements for annexing land into a city:

(2)  General authority. Cities have the authority to annex land into a city upon compliance with the procedures required in this section. In any annexation proceeding, all portions of highways lying wholly or partially within an area to be annexed shall be included within the area annexed unless expressly agreed between the annexing city and the governing board of the highway agency providing road maintenance at the time of annexation. Provided further, that said city council shall not have the power to declare such land, lots or blocks a part of said city if they will be connected to such city only by a shoestring or strip of land which comprises a railroad or highway right-of-way.

(emphasis added).

64.     Pocatello has engaged in a regulatory taking in that it has, in concert with Town Center JV, Millennial and Portneuf Development, cut off access to the Rupp Trust Property, precluding its development.

65.     Pocatello has done so in approving both the annexation itself and the deed over of the right-of-way from Town Center JV, Millennial and Portneuf Development in

a manner to create 10-foot control strips on both sides of Northgate Parkway that bar access to the Rupp Trust Property.

66.     Such control strips violate Pocatello Ordinance 16.20.050(D).

67.     Such annexation was inconsistent with both Pocatello's own annexation ordinance and the applicable requirements of the Idaho Code.

68.     Pocatello approved both an annexation that prevents Chubbuck from controlling access to the Northgate Parkway and gave Town Center JV, Millennial, and Portneuf Development the ability to deny access to the Rupp Trust Property for development.

69.     By blocking access to their property, Pocatello has effectively prevented commercial and residential development on the Rupp Trusts Property.  These actions severely diminished and continue to diminish the marketability and value of the property.

70.     Pocatello's actions constitute regulatory takings as defined under the 5th Amendment of the United States Constitution, as applied under the 14th Amendment, and adopted by the Idaho Constitution under Article I § 14.

71.     Pursuant to I.C. § 67-8001 et. al., Rupp Trusts sent Pocatello a written demand for a regulatory takings analysis.  Pocatello responded, denying that a regulatory taking had occurred. Pocatello's response misstates well-established authority and precedent in both the Idaho Supreme Court and the United States Supreme Court that a taking can consist of a "physical" and/or a "regulatory taking[]."  A regulatory taking occurs when the governmental action deprives a property owner from access to and/or use of a property, including development rights.

72.    Plaintiffs are entitled to damages for Pocatello's regulatory takings, including all allowed damages that have and will occur as a result of Pocatello's actions depriving the Rupp Trusts' of their property rights.

73.    As a result of the diminished property rights, the Rupp Trusts were prevented from entering into several purchase and sale agreements with *bona fide* and viable prospective purchasers. Such prospective buyers have included a range of individuals and entities wanting to construct a variety of projects, on the most desirable ground east of the Northgate Interchange.

74.    The Rupp Trusts have a justiciable cause of action for relief under the 5th and 14th Amendment of the U.S. Constitution for just compensation for Pocatello's regulatory takings.

75.    The Rupp Trusts also have a justiciable cause of action for relief under 42 U.S.C. § 1983, including the following:

a.    A declaration invalidating the unlawful annexation ordinance of Pocatello any other action or transaction taken in concert with Pocatello that deprived Rupp Trusts of their property rights without just compensation.

b.    Injunctive relief preventing Pocatello from implementing ordinances or taking other further actions depriving the Rupp Trusts of property rights.

c.    Damages caused by Pocatello's actions, including from lost economic opportunities suffered by the Rupp Trusts.

d.    The equivalent of the diminished fair market value to the Rupp Trusts property.

    e.   Punitive damages for actions taken by Pocatello that were malicious, oppressive or in reckless disregard to Rupp Trusts' rights.

76.    Wherefore, the City of Pocatello should be held liable to Plaintiffs for all potential remedies available under the 5th and 14th Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT II: DECLATORY JUDGMENT
### (Against City of Pocatello)

77.    Plaintiff realleges the allegations set forth above in the Complaint as if set forth below.

78.    Pursuant to 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration . . . ."

79.    Pocatello violated Pocatello Ordinance 17.02.110 in that the annexation did not follow Idaho Code § 50-222(2) whereby a "city council shall not have the power to declare such land, lots or blocks a part of said city if they will be connected to such city only by a shoestring or strip of land which comprises a railroad or highway right-of-way."

80.    Yet, in annexing Northgate Parkway, Pocatello did exactly that.  The annexed land consists of three parcels.  The Northgate Parkway portion, that intrudes into Chubbuck, is only connected by another small piece consisting of a road turn-about at the intersection of Olympus Drive and Northgate Parkway.

81.    Wherefore, Plaintiffs request that the Court declare Pocatello's annexation of the Northgate Parkway unlawful and set the same aside.

## COUNT III: CIVIL CONSPIRACY
### (Against City of Pocatello, Millennial Partners, LLC, Portneuf Builders, LLC, and Individuals)

82.     Plaintiff realleges the allegations set forth above in the Complaint as if set forth below.

83.     In Idaho, a civil conspiracy exists if there is an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful matter.  *McPheters v. Maile*, 138 Idaho 391, 395, 64 P.3d 317. 321 (2003)(citation omitted).

84.     Here, Pocatello, Millennial, Portneuf Development, and the various identified individuals worked in concert and in secret to deny the Rupp Trust Properties access to Northgate Parkway, and in violation of public disclosure laws.

85.      Pocatello did so by annexing property in defiance of Pocatello Ordinance 17.02.110 and Idaho Code § 50-222(2).

86.     Millennial and Portneuf Development sought to and succeeded in having the Northgate Parkway Property annexed into Pocatello through a dissolved entity Town Center JV, that was no longer authorized to engage in such actions.

87.     All parties coordinated to create the improper "control strips" to deny the Rupp Trust access to Northgate Parkway.

88.     The various individuals involved facilitated the acts specified.

89.     Such has damaged Plaintiffs.

90.     Wherefore, Plaintiffs are entitled to both equitable and monetary relief as allowed under law for Defendants' civil conspiracy.

## COUNT IV: LANHAM ACT
**(Against Millennial  Partners, LLC, and Portneuf Development, LLC)**

91.     Plaintiff realleges the allegations set forth above in the Complaint as if set

forth below.

92.     15 U.S.C. § 1125(a) provides:

(a)Civil action
 (1) Any person who, on or in connection with any goods or
 services, or any container for goods, uses in commerce any word,
 term, name, symbol, or device, or any combination thereof, or any
 false designation of origin, false or misleading description of fact,
 or false or misleading representation of fact, which—

   (A)   is likely to cause confusion, or to cause mistake, or to
     deceive as to the affiliation, connection, or association
     of such person with another person, or as to the
     origin, sponsorship, or approval of his or her goods,
     services, or commercial activities by another person,
     or

   (B)   in commercial advertising or promotion,
     misrepresents the nature, characteristics, qualities, or
     geographic origin of his or her or another person's
     goods, services, or commercial activities,

     shall be liable in a civil action by any person who believes
     that he or she is or is likely to be damaged by such act.
     (emphasis added)

93.     Millennial and Portneuf Development were and are general partners in

connection with Town Center JV for Northgate Parkway.

94.     Millennial 's website links to a sub-site, owned by Millennial, with the

web address of https://www.northgatedistrict.com/,  includes the following image as one

goes to the page:



This image shows the Northgate Interchange, looking east, and that property around the interchange on the east side of I-15 is the Rupp Trust Property.

95.    The front page of northgatedistrict.com also features a video which shows what is believed to be various developments in Salt Lake County and the Park City area of Utah and the following scene:



This image is the east side of I-15 at the Northgate Interchange and shows the

Rupp Trust Property on both sides of Northgate Parkway.

96.     The web site contains the following text:

**Northgate, at the center of an interstate corridor connecting the booming Salt Lake Valley's business market with the largest and most prestigious intermountain universities, is strategically situated to capture this growth.**

The connection at Northgate, is actually the Rupp Trust Property.

97.     The contact image at the bottom of the web page consists of the following:



This image is of the Rupp Trust Property, looking to the west towards I-15.

98.      Available on that website is a Northgate Brochure that, at the bottom, contains the following image:



This image is the Rupp Trust Property, again looking towards I-15.

99.     These images are inherently misleading in that the property portrayed is neither owned by or available to either Millennial and/or Portneuf Development.

100.     The clear – and false  –  implication is that the Rupp Trust Property is available for sale by Millennial and/or Portneuf Development.

101.     The website and brochure are part of a commercial promotion for possible purchasers or tenants of commercial property and/or residences offered by Millennial and/or Portneuf Development.

102.     This misrepresentation likely has deceived multiple parties into believing that Millennial and/or Portneuf Development has the Rupp Trust Property available for

purchase and that they are the ones that can deliver it to an interested party. These misrepresentations are intended to direct interested third party purchasers away from the Rupp Trusts, leading them instead to Millennial and/or Portneuf Development.

103.    This website's availability is worldwide and the brochure has undoubtedly been distributed to parties both in and outside Idaho, seeking to invest, purchase or lease property, constituting interstate commerce.

104.    At the very least, Millennial and/or Portneuf Development's misrepresentation has caused or is likely to cause parties to approach them rather than the Rupp Trusts concerning the Rupp Trust Property, resulting in lost sales and confusion as to control and origin.

105.    Additionally, Millennial and/or Portneuf Development has mis-appropriated the Rupp Trust Property to market sells of their property.

106.    Wherefore, pursuant to 15 U.S.C. § 1117, Rupp Trusts are entitled to recovery of Millennial and/or Portneuf Development's profits including any sales of property in the area, damages from Rupp Trusts' lost opportunities, other damages allowed under law, and attorney fees and costs.

## COUNT V: ATTORNEY'S FEES AND COSTS

107.    Plaintiff realleges the allegations set forth above in the Complaint as if set forth below.

108.    Plaintiff has been required to retain the services of Olsen Taggart PLLC to prosecute this action and have agreed to pay a reasonable attorney fees and costs incurred in pursing this action and that $50,000.00 is a reasonable attorney fee should this action result in a default judgment, plus costs and such other sums as the Court

deems proper should the action be contested and that said fees should be awarded pursuant to applicable statutory provisions or rules.

**WHEREFORE, Plaintiffs request that the Court grant the following relief:**

1.      In regards to Count I, a monetary judgment against the Pocatello for the amount of just compensation as allowed under law under the 5th Amendment, and other damages as allowed under 42 U.S.C. § 1983 described herein; appropriate declaratory and injunctive relief allowed under § 1983; and punitive damages.

2.      In regards to Count II, a declaratory judgment against the Pocatello declaring Pocatello's annexation of the Northgate Parkway unlawful and set the same aside.

3.      In regards to Count III, a judgment against Defendants for equitable relief and monetary damages, as the trier of fact determines to be just.

4.      In regards to Count IV, a monetary judgment against Millennial and/or Portneuf Development for recovery of Millennial and/or Portneuf Development's profits, Plaintiffs' damages and attorney fees and costs.

5.      In regards to Count V, a monetary judgment against Defendants for the attorney fees and costs Plaintiffs have incurred in pursing this action or such further sums as the Court deems proper should the action be contested, and if this action results in a default judgment, reasonable attorney fees of $50,000.00 plus costs.

6.      Any other relief the Court may deem just and proper.

DATED:        February 4, 2022

OLSEN TAGGART PLLC

/s/ Nathan M. Olsen
Nathan M. Olsen
Attorney for the Plaintiffs

# RIGHT-OF-WAY PURCHASE AND SALE AGREEMENT

THIS RIGHT-OF-WAY PURCHASE AND SALE AGREEMENT (the "Agreement") is made and entered into to be effective as of  April 6, 2017, (the "Effective Date") by and between the HAROLD L RUPP SR TRUST and the VEDA J RUPP REVOCABLE LIVING TRUST, collectively ("Seller"), and Millennial Development Partners, LLC, a Utah limited liability company ("Buyer") (collectively, the "Parties").

## RECITALS

A.      Seller is the owner of, and or has equitable title to, approximately 30-40 acres of real property located in Bannock County, Idaho, more particularly described below (the "Property").

B.      Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Property on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the promises, covenants, representations and warranties set forth in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as set forth below.

## AGREEMENT

1.      DEFINITIVE AGREEMENT FOR PURCHASE AND SALE OF THE PROPERTY. Upon full execution, this Agreement shall be a binding agreement between Buyer and Seller for the purchase and sale of the Property on the terms, conditions and provisions set forth in this Agreement (the "Transaction"). This Agreement shall supersede all other written or oral agreements between Buyer and Seller concerning the Transaction. Sellers desire to sell the Property under the terms and conditions herein.

2.      OWNERSHIP OF PROPERTY. The Property is owned, as of Effective Date, by Seller.

3.      DESCRIPTION OF THE PROPERTY. The Agreement pertains to the purchase of approximately 30-40 acres; constituted from multiple parcels, as described generally in section 3(a) below. The exact legal description, boundaries, and acreage of land purchased within each parcel shall be established by a survey, performed by a licensed surveyor, at the sole cost and expense of Buyer prior to closing (the "Survey").

a. The Property is comprised of the following parcels and acreages.

i. Parcel R3853000502 ("West Parcel"), containing approximately 7 acres, more or less, as depicted generally in Exhibit "A" with red shading. This parcel shall be of appropriate size and configuration to contain the northbound off ramp, the northbound on ramp, and other features of an interchange appropriately sized to accommodate a 150- foot-wide connecting road.

*NDR*

1

ii.  Parcel R3853000400 ("Middle Parcel"), containing approximately 21 acres, more or less, as depicted generally in Exhibit "A" with yellow shading.  This parcel shall be 150 feet wide from the West Parcel, until reaching the Rupp-Hart Property Line, where it will continue eastward with a 150-foot width until adjoining the East Parcel.

iii. Parcel R3851001400 ("East Parcel"), containing approximately 6 acres, more or less, as depicted generally in Exhibit "A" with blue shading. This parcel shall be 150 feet wide at its western connection with the Middle Parcel, and shall bend slightly northward, generally widening at the curve as indicated, to connect with the property presently owned by the Hart Family to the east.

iv. These parcels total between 30-40 acres. Parties understand and agree  that the total acreages of these parcels may change based upon final survey, and that the total purchase price will be adjusted accordingly.

4.    RESERVED

5.    PURCHASE PRICE OF THE PROPERTY. The Purchase Price for the Property shall be according to the following schedule and terms:

a.  Lands within the West Parcel contain approximately Seven (7) acres. These shall be sold and purchased according to the following schedule and terms:

   i.   Five Thousand Dollars per Acre ($5,000/acre) shall be donated by Seller to the State of Idaho. In all, this shall be recognized for legal purposes as a donation of $35,000 to the State of Idaho.

   ii.  Fifteen Thousand Dollars per Acre (7 acres x $15,000/acre = **$105,000**) shall be paid in cash at closing by Buyer.

   iii. The lands to be sold and purchased within the West Parcel are identified with red shading in Exhibit "A", subject to adjustment in accordance with the Survey.

b.  Lands within the Middle Parcel contain approximately Twenty One (21) acres. These shall be sold and  purchased for Two Hundred Seventy Thousand Dollars ($270,000), according to the following schedule and terms:

   i.   Fifteen (15) acres shall be sold and purchased for Fifteen Thousand Dollars per Acre (15 x $15,000/acre = **$225,000** total).

   ii.  Six (6) acres shall be sold and purchased for Seven Thousand Five Hundred Dollars per Acre (6 x $7,500/acre= **$45,000** total).

*HOR*
2

**EXHIBIT "A"**
**Page 2 of 19**

> iii.   The lands to be sold and purchased in the Middle Parcel are identified with yellow shading in Exhibit "A", the purchase of which shall be paid in cash at closing, subject to adjustment in accordance with the survey.

   c.   Lands within the East Parcel contain approximately Six (6) acres. These shall be sold and purchased for Seventy Five Thousand Dollars ($75,000) according to the following schedule and terms:

> i.   Four (4) acres shall be sold and purchased for Fifteen Thousand Dollars per Acre (4acres x $15,000/acre = **$60,000** total).

> ii.   Two (2) acres shall be sold and purchased for Seven Thousand Five Hundred Dollars per Acre (2 acres x $7,500/acre = **$15,000**).

> iii.   The lands to be sold and purchased within the East Parcel are identified with blue shading in Exhibit "A"; the purchase shall be paid in cash at closing, subject to adjustment in accordance with the Survey.

   d.   Any additional lands needed to be purchased for Right of Ways shall be sold and purchased for the sum of Fifteen Thousand Dollars per Acre ($15,000/acre).

6.   <u>PAYMENT OF THE PURCHASE PRICE</u>. Buyer shall pay the Purchase Price as follows:

   a.   <u>Earnest Money Deposit</u>. Within ten (10) business days after the full execution of this Agreement, Buyer shall deposit into escrow with Pioneer Title (the "Escrow Agent") Five Thousand Dollars ($5,000.00) in immediately available funds (the "Earnest Money Deposit"). The Earnest Money Deposit shall be held in a federally-insured interest-bearing account with interest to accrue for the benefit of Buyer, and will be applied as a credit to the Purchase Price at the closing, or will be delivered to either Seller or Buyer as outlined below. All references in this Agreement to "Earnest Money Deposit" shall mean the Earnest Money Deposit and all accrued interest.

   b.   <u>Cash Payment</u>. Buyer shall make cash payment at Closing, as outlined and indicated in Section 9 of this Agreement.

7.   <u>DISPOSITION OF EARNEST MONEY DEPOSIT</u>. From and after the full execution of this Agreement until Buyer's review of the Property during the Feasibility Review Period (as defined below); the Earnest Money Deposit is fully-refundable to Buyer. If Buyer elects to terminate this Agreement on or before the end of the Feasibility Review Period, the Earnest Money Deposit shall be released to Buyer, this Agreement shall terminate and neither party shall have any obligations to the other that are not expressly intended to survive termination.

8.   <u>BUYER'S DUE DILIGENCE REVIEW</u>. Buyer may elect not to proceed with the Transaction and shall be entitled to a return of the Earnest Money Deposit, if the following matters are not completed to Buyer's satisfaction:

*HoR*

3

a. <u>Commitment for Title Insurance</u>. Within sixty (60) business days after the full execution of this Agreement, Buyer shall obtain a commitment from the Escrow Agent for standard coverage title insurance for the Property in the amount of the estimated Purchase Price (the "Commitment"). Buyer shall cause Escrow Agent to provide a copy of the Commitment to Seller. Buyer has until expiration of the Feasibility Review Period to review and to object in writing to any easements, liens, encumbrances or other exceptions or requirements in the Commitment (the "Title Objections"). If Buyer fails to object within the time specified, then the condition of title to the Property reflected on the Commitment will be deemed approved. If the Title Objections are made prior to the expiration of the Feasibility Review Period, Seller shall attempt to eliminate the matters covered by the Title Objections within sixty (60) days of receipt of such Title Objections. If Seller is unable to satisfy the Title Objections to Buyer's satisfaction, Buyer may terminate this Agreement and receive a return of the Earnest Money Deposit. Seller shall eliminate at Seller's sole cost and expense any deeds of trust, mortgages, judgment liens, mechanics' liens, material men's liens and any other similar liens placed on or against the Property at or prior to the Closing. The Commitment shall be updated at Buyer's expense sixty (60) days before the Closing, and the same review and cure periods shall apply.

b. <u>Survey</u>. Buyer shall commission an ALTA survey of the Property including topography (the "Survey"). Buyer shall have until the later of (i) sixty (60) days after Buyer's receipt of the Survey and (ii) the end of the Feasibility Review Period to review the Survey and raise objections (the "Survey Objections"). If Buyer fails to object within the time specified, then the Survey will be deemed approved. If the Survey Objections are timely made, Seller shall attempt to eliminate the matters covered by the Survey Objections within sixty (60) days of receipt of such Survey Objections. If Seller is unable to correct the Survey Objections, or the parties cannot agree on the boundaries of the Property, then Buyer shall have the right to terminate this Agreement, in which case the Earnest Money Deposit will be delivered to Buyer.

c. <u>Title Insurance Policy</u>. At the Closing, Buyer shall purchase at Buyer's sole cost and expense, an ALTA standard coverage owner's policy of title insurance with respect to the Property (the "Title Policy"), insuring fee simple title to the Property in Buyer, subject only to those matters affecting title to the Property approved or waived by Buyer in accordance with this Agreement (the "Permitted Exceptions").

d. <u>Buyer's Feasibility Review</u>. Buyer shall have ninety (90) days after the Effective Date of this Agreement to conduct its due diligence review of the Property (the "Feasibility Review Period"). From and after execution of this Agreement until the Closing, Seller will provide Buyer with full access to the Property for the purpose of conducting soils testing, engineering studies, a survey and other investigations necessary to determine the suitability of the Property for Buyer's intended use. Such analysis and testing will be at Buyer's sole cost and Buyer shall indemnify and hold Seller harmless in connection with any claims arising from entry by Buyer or Buyer's officers, employees, agents or representatives on the Property. To the extent that Buyer conducts any of the foregoing tests, Buyer will reasonably restore the Property to the

*NdR*

4

state at which it existed prior to the testing. Buyer will be able to terminate this Agreement at any time during the Feasibility Review Period for any reason, and to receive a complete refund of the Earnest Money Deposit, by notifying Seller in writing before the end of the Feasibility Review Period.

e. <u>Initial Due Diligence Materials</u>. Within twenty one (21) days after the full execution of this Agreement, to the extent available to Seller, Seller will deliver to Buyer all documents and studies relating to the Property. Such documents to be provided by Seller shall include, without limitation, a Seller's Property Disclosure, in the form approved by the Board of Realtors, all existing reports, surveys, engineering studies, soils reports, environmental surveys, improvement plans, payback agreements, liquefaction tests, flood plain maps, covenants, conditions and restrictions, and other material relating to the Property in Seller's possession or in the possession of Seller's agents. If Buyer does not acquire the Property, Buyer shall return to Seller all of the materials provided by Seller hereunder.

f. <u>Additional Due Diligence Materials</u>. Seller recognizes that Buyer will identify issues that may need to be resolved prior to the Closing, as Buyer becomes more familiar with the Property (the "Additional Due Diligence Items"). Buyer shall have the right prior to the Closing to provide one or more written requests to Seller for Additional Due Diligence Items. Seller agrees to make reasonable efforts to provide any such existing Additional Due Diligence Items.

9. <u>CLOSING</u>.

a. <u>Time and Place</u>.

    i. <u>Closing</u>. In the event that the Siphon/Northgate Interchange is approved and its essential requirements have been met by June 30, 2017, the closing on the Property ("Closing") will take place in the offices of the Escrow Agent, or any other place as the parties may mutually agree, but on such a date as to support immediate construction of the interchange and connecting road and/or utility infrastructure installation, (the "<u>Closing Date</u>"). In the event that the interchange is not approved or its essential requirements have not been met by July 31, 2017, the Closing shall be held no earlier than January 18, 2018.

b. <u>Seller's Closing Deliveries</u>. No later than one (1) business day before the Closing, Seller shall deliver to Escrow Agent the following: (i) a Special Warranty Deed, in a form reasonably acceptable to Buyer, fully-executed and properly acknowledged by Seller conveying the Property (or the designated portion thereof) to Buyer subject only to the Permitted Exceptions; and (ii) any other instruments or documents as may be reasonably requested by Buyer or Escrow Agent or reasonably necessary to effect or carry out the purposes of this Agreement (which instruments or documents are subject to Seller's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed).

<div align="center">

*HJR*
5

</div>

<div align="right">

**EXHIBIT "A"**
**Page 5 of 19**

</div>

c.    Buyer's Closing Deliveries. At the Closing, Buyer shall deliver to Escrow Agent the following: (i) (1) cash in the amount of the purchase price for the Property (less the Earnest Money Deposit); and (ii) any funds for closing costs, instruments or documents as may be reasonably requested by Seller or the Escrow Agent, or necessary, to effect the purposes of this Agreement (which funds, instruments or documents are subject to Buyer's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed).

d.    Closing Costs. Buyer shall pay the costs of the premium for the Title Policy in the amount of the Purchase Price for the portion of the Property conveyed and the cost of any curative endorsements offered by Seller as a cure to any of Buyer's Title Objections. Buyer will pay any additional premium required for an ALTA extended owner's policy of title insurance and the cost of any endorsements requested by Buyer. All charges and assessments related to the portion of the Property conveyed shall be prorated between the parties as of the Closing Date.

At the Closing, Seller shall pay the roll-back taxes, if any, for the portion of the Property conveyed. Real property taxes shall be prorated between the parties as of the Closing Date based upon the latest available tax information from the Bannock County Assessor. All other costs associated with the Closing must be borne by the parties in accordance with custom in Bannock County, Idaho, as determined by Escrow Agent, unless otherwise specified in this Agreement.

e.    Possession. Buyer and Seller acknowledge that the Property is under a current Lease Agreement for farming with the 2017 Lease payments current to the Seller for the 2017 crop year. Buyer will be entitled to possession of the Property within one (1) day after the 2017 crop has been harvested by the current Lessee, or one (1) day after the Closing, (whichever is the later date), for the Property acquired at such Closing.

10.    CONTINGENCIES TO CLOSING. There are several other outside transactions and funding events, each of which must successfully occur, for the MPC to be viable. Accordingly, in the event the following outside transactions or funding events do not occur to Buyer's satisfaction, Buyer or Seller may terminate this Agreement at Buyer's sole discretion, and notwithstanding anything to the contrary herein, shall be entitled to the return of its Earnest Money Deposit:

a.    Purchase of Dependent Properties. Buyer intends to purchase and include in a Master Planned Community, properties and essential rights-of-way owned by two other owners (Mountain View Farms and the Hart Family), as depicted on Exhibit "B" hereto (identified as the "Dependent Properties" and the various "ROW" alignments). Buyer or Seller shall not be obligated to close on this Agreement unless Buyer has a fully executed Real Estate Purchase and Sale Agreement in connection with the Dependent Properties to Buyer's satisfaction.

b.    Freeway Interchange Funding. Buyer intends for an interchange, known as the "Siphon Interchange", from Interstate Highway 15 to be constructed to provide access to the MPC. Buyer is working with the State of Idaho to provide funding for

*NA*
6

the planning and construction of the Siphon Interchange. However, if such funding and construction does not occur, Buyer or Seller shall be under no obligation to close on this Agreement.

c.     Master Planning Approvals. Buyer will engage in a master planning process with Bannock County for the Property and the Dependent Properties. In the event Buyer does not obtain satisfactory entitlement and zoning approvals for the MPC, Buyer or Seller shall not be obligated to close on this Agreement.

d.     Development Funding. Buyer will depend on third-party financing and funding of the physical development of the Property and Dependent Properties. In the event Buyer does not obtain satisfactory development funding to construct the MPC, Buyer or Seller shall not be obligated to close on this Agreement.

e.     Additional Contracts. Buyer acknowledges that a separate agreement is being developed between Seller and Portneuf Development, LLC, the City of Pocatello and/or Bannock County for placement of an additional Intersection and water and sewer line stubs. In the event that Seller does not obtain a satisfactory agreement as outlined in Section 15, paragraph (b) of this agreement, Buyer or Seller shall not be obligated to close on this Agreement.

11.     SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS. Seller represents, warrants and covenants to Buyer that:

a.     Organization and Standing. Sellers individually have full power and authority to enter into this Agreement and complete the Transaction.

b.     Binding Agreement. Upon Seller's execution of this Agreement, this Agreement will be binding and enforceable against Seller in accordance with its terms, and upon Seller's execution of the additional documents contemplated by this Agreement, they will be binding and enforceable against Seller in accordance with their terms, except as such enforcement may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to enforcement of creditor's rights generally, and (ii) general equitable principles.

c.     Buyer's Access. From and after the date of this Agreement, Seller agrees to provide Buyer, its employees, agents and representatives access to the Property to conduct such tests, perform such analysis, and complete such tasks as may be required by Buyer. Buyer agrees to indemnify, defend and hold Seller harmless from any damage to Seller or the Property relating to Buyer's activities on the Property prior to the Closing.

d.     Hazardous Materials. Except for herbicides, pesticides and other materials traditionally used in farming in the area where the Property is located, Seller has no actual knowledge of the presence or existence of any Hazardous Materials (as defined below) or petroleum underground storage tanks on the Property. From and

*H d R*
7

after the date of this Agreement, Seller shall not cause or permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, to or from the Property, except for herbicides, pesticides and other materials traditionally used in farming in the area where the Property is located. As used in this Agreement, the term "Hazardous Materials" shall mean any hazardous or toxic waste, substance or material as presently defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. Section 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C.A. Section 1801, et seq.; the Resource Conversation and Recovery Act, 42 U.S.C.A. Section 6901, et seq.; the Toxic Substances Control Act, 15 U.S.C.A. Section 2601, et seq.; the Federal Water Pollution Control Act, 33 US.C.A. Section 1251, et seq.; and any state environmental laws.

e.      No Water Rights. Seller acknowledges the Transaction does not include any water rights or water shares of any kind.

f.      No Condemnation Proceedings. To the best of Seller's actual knowledge, there are no condemnation proceedings, eminent domain proceedings, or similar actions or proceedings now pending or threatened against the Property.

g.      No Litigation. Seller is not now a party to any litigation (i) with any present or former tenant of the Property, (ii) with any person having any interest in the Property, (iii) affecting or questioning Seller's interest in the Property or Seller's ability to perform its obligations under this Agreement. To the best of Seller's actual knowledge, there is no litigation or threatened litigation with any regulatory bodies having jurisdiction over the Property, or with any present, former or future tenants of the Property or otherwise affecting or questioning Seller's interest in, or use of, the Property or any part thereof. To the best of Seller's actual knowledge, there is no other litigation existing, pending or threatened relating to the Property.

h.      No Violations. To the best of Seller's actual knowledge, there has been no violation of any applicable building, zoning or other ordinances, resolutions, statutes or regulations of any government of governmental agency governing the Property, including, but not limited to, environmental control agencies with respect to the operation, use, maintenance, or condition of the Property or any part thereof, or requiring any repairs or alterations of the Property or any portion thereto.

i.      No Flood Plain. To the best of Seller's actual knowledge, no portion of the Property is located within a flood plain or similarly designated zone per applicable FEMA maps.

The foregoing representations, warranties and covenants shall be true, correct and accurate on and as of the date of this Agreement and on and as of the Closing Date(s). All representations, warranties and covenants by Seller set forth in this Agreement will survive the consummation of this Agreement, and the delivery and recordation of the Special Warranty Deed(s) for the Property for a period of twelve

8

(12) months after the applicable Closing Date.

12.     BUYER'S REPRESENTATIONS AND WARRANTIES. Buyer represents and warrants to Seller that:

a.      Organization and Standing. Buyer is a validly existing Utah Limited Liability Company and has full power and authority to enter into this Agreement and complete the Transaction. Further, each person signing on behalf of Buyer is authorized by Buyer to sign this Agreement.

b.      Binding Agreement. This Agreement will be binding and enforceable against Buyer in accordance with its terms, and upon Buyer's execution of the additional documents contemplated by this Agreement, they will be binding and enforceable against Buyer in accordance with their terms, except as such enforcement may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to enforcement of creditor's rights generally, and (ii) general equitable principles.

The foregoing representations, warranties and covenants shall be true, correct and accurate on and as of the date of this Agreement and on and as of the Closing Date (of each Closing if there is more than one Closing). All representations, warranties and covenants by Buyer set forth in this Agreement will survive the consummation of this Agreement, and the delivery and recordation of the Special Warranty Deed(s) for the Property for a period of twelve (12) months after the applicable Closing Date.

13.     "AS IS" Condition of Property. Buyer acknowledges that Seller and/or Seller's agents have made no representations of any material fact concerning the Property except for those expressly provided in this Agreement; that Buyer or its agent has had, or will have during the Feasibility Review Period, adequate opportunity to inspect and investigate the Property; that Buyer or its agent has made, or will make during the Feasibility Review Period, a thorough independent examination and inspection of the Property and, except for the representations and warranties and materials delivered or to be delivered by or on behalf of Seller hereunder, Buyer is relying solely upon its own examination and inspection thereof; and, that Buyer is acquiring the Property "AS IS."

14.     RISK OF LOSS. The risk of loss will be upon Seller until the relevant Closing. In the event of any loss or damage to or condemnation of any portion of the Property prior to the relevant Closing, Buyer may cancel this Agreement in its sole discretion. In the alternative, the parties may mutually agree on an adjustment to the square feet and the Purchase Price to reflect the loss, damage or condemnation.

15.   ADDITIONAL BUYER COMMITMENTS.

a.   Buyer shall provide, at no expense to seller, sewer and water utility line stubs at 3 locations on the north side of the ROW on the Rupp Property. The first utility stub shall be located at the Olympus Road connection, with two additional water and sewer utility line stubs located east of the Olympus Road connection at approximate equal intervals, as Seller is making no infrastructure investment west of the extension of Olympus Road.

b.   Buyer acknowledges that a separate agreement is being developed between Seller and Portneuf Development, LLC, the City of Pocatello and/or Bannock County for placement of an additional Intersection with water and sewer line stubs. This future Intersection shall be located approximately 1400 feet east of the current Interstate ROW. Under this separate conceptual agreement, an additional sewer line would be installed parallel to the Interstate on the east ROW, with a sewer stub located on both the north and south sides of the new interchange, and with the sewer line continuing south to a sewer lift station, for future development on the Rupp property. This Intersection, water and sewer stubs and sewer line shall be done at no costs to the Rupp's. Buyer is agreeable to this conceptual intersection, and will accommodate its convenient future construction within the roadway designs.

16.   DEFAULT AND REMEDIES.

a.   Seller's Default. If Seller fails to perform any of Seller's obligations under this Agreement and that failure continues for five (5) business days after Seller's receipt of written notice from Buyer, or if any of Seller's representations or warranties contained in this Agreement shall be untrue, inaccurate or incomplete at any time, Seller shall be in default and Buyer may as Buyer's remedies for Seller's failure: (i) without waiving any rights or remedies, proceed to consummate the Transaction; (ii) cancel this Agreement in accordance with Section 14 and receive a return of the Earnest Money Deposit and (the Extension Fee, if paid); or (iii) bring an appropriate action for specific performance of this Agreement.

b.   Buyer's Default. If Buyer fails to perform any of Buyer's obligations under this Agreement and that failure continues for five (5) business days after Buyer's receipt of written notice from Seller, or if any of Buyer's representations or warranties contained in this Agreement shall be untrue, inaccurate or incomplete at any time, Buyer shall be in default and Seller may as Seller's remedies for Buyer's failure: (i) cancel this Agreement in accordance with Section 14 and retain the Earnest Money Deposit; or (ii) bring an appropriate action for specific performance of this Agreement. If Seller elects as its remedy to retain the Earnest Money Deposit as liquidated damages, Seller and Buyer hereby agree that it would be impracticable and extremely difficult to fix the amount of Seller's actual damages and further agree that the Earnest Money Deposit is a reasonable estimate of the amount Seller might be damaged as a result of Buyer's failure to perform under this Agreement.

10

c.   General Terms. In no event shall either party be entitled to bring a claim against the other party for consequential damages. A party's failure to perform any monetary obligation shall not give rise to the other party's obligation to provide notice with a cure period (i.e., Buyer's failure to deliver the Purchase Price on the Closing Date).

17.   CANCELLATION. If Buyer or Seller elects to cancel this Agreement as provided under this Agreement, the canceling party shall give written notice of the cancellation to the other party and the Escrow Agent. Upon cancellation by a party or automatic cancellation as provided in this Agreement, the Escrow Agent shall disburse the Earnest Money Deposit in accordance with Sections 6 and 13, and the Escrow Agent shall return all documents deposited in the escrow to the party who supplied the documents. Upon delivery of the Earnest Money Deposit and documents, this Agreement and the escrow will be deemed cancelled and terminated, and except as provided in this Agreement, neither party will have any further liability or obligation under this Agreement.

18.   NO COMMISSIONS. Neither party is represented by a real estate broker or agent.

Seller agrees to indemnify, defend and hold Buyer harmless from any claims for real estate commissions or finder's fees pursuant to this Transaction arising from claims relating to brokers or agents allegedly engaged by Seller. Buyer agrees to indemnify, defend and hold Seller harmless from any claims for real estate commissions or finder's fees pursuant to this Transaction arising from claims relating to brokers or agents allegedly engaged by Buyer.

19.   ATTORNEYS' FEES. If there is any dispute between Seller and Buyer to enforce or interpret any provisions of this Agreement or rights arising under this Agreement, the unsuccessful party in the dispute, as determined by the court, mediator or arbitrator, shall pay to the successful party, all reasonable costs and expenses, including but not limited to reasonable attorneys' fees incurred by the successful party.

20.   NOTICES. Except as otherwise required by law, any notice given in connection with the Transaction must be in writing and must be given by personal delivery, overnight courier service, confirmed facsimile, email or United States certified or registered mail, return receipt requested, postage prepaid, addressed to Seller or Buyer as follows (or at another address or facsimile number as Seller or Buyer or the person receiving copies may designate in writing):

**SELLER**:            H. Lavelle Rupp Jr.
                       P.O. Box 5307
                       Chubbuck, Idaho 83202
                       Email: levelrupp@aol.com

**SELLER**:            Christine R. Petersen
                       2340 S 45th E
                       Ammon, Idaho 83406
                       Email: grannychristine@msm.com

*Nℐℛ*
11

**SELLER's ATTORNEY**:    Lane V. Erickson, Esq
                          Racine Law Office
                          P.O. Box 1391
                          Pocatello, Idaho 83204-1391
                          Email: lve@racinelaw.net


**BUYER**:                 Arvil "Buck" Swaney
                           1685 E. Haven Brook Cir.
                           Salt Lake City, Utah 84121
                           Email: buckswaney@gmail.com

                           With a copy to:
                           Paxton Guymon: Paxton@yorkhowell.com

**ESCROW AGENT**:          Marie Hunter
                           Pioneer Title
                           208-233-9595
                           Email: mhunter@pioneertitlrco.com


Notice is deemed to have been given on the date on which notice is delivered, if notice is given by personal delivery, confirmed facsimile or email, on the date of delivery to the overnight courier service, if that service is used, and two days after deposit in the mail, if mailed.

21.     ADDITIONAL ACTS. The parties agree to execute promptly all other documents and perform all other acts as may be reasonably necessary to carry out the purpose and intent of this Agreement.

22.     GOVERNING LAW. This Agreement is governed by, and construed and enforced in accordance with; the laws of the State of Idaho and venue for any action arising from or relating to this Agreement shall be in an Idaho court of competent jurisdiction sitting in Bannock County.

23.     BUSINESS DAYS. If this Agreement requires any act to be done or action to be taken on a date that is not a business day, that act or action will be deemed to have been validly done or taken if done or taken on the next succeeding business day.

24.     WAIVER. The waiver by any party to this Agreement of any right granted to it under this Agreement is not a waiver of any other right granted under this Agreement, nor may any waiver be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

25.     SURVIVAL. All of the covenants, agreements, representations and warranties set forth in this Agreement survive the Closing(s) for the periods set forth in this Agreement, and do

*NJR*
12

**EXHIBIT "A"**
**Page 12 of 19**

not merge into any deed, assignment or other instrument executed or delivered under this Agreement.

26.    COUNTERPARTS. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitute one and the same instrument.

27.    SUCCESSORS AND ASSIGNS. This Agreement is binding upon and inures to the benefit of the parties to this Agreement and their respective successors and assigns. Buyer shall not assign all or any of its rights under or interest in this Agreement without Seller's prior written consent. Seller may assign all or any of its rights under or interest in this Agreement without Buyer's prior written consent, so long as Seller's successor agrees to honor the terms of this Agreement.

28.    ENTIRE AGREEMENT. This Agreement sets forth the entire understanding of the parties with respect to the matters set forth in this Agreement as of the date of this Agreement; it supersedes all prior oral or written agreements of the parties as to the matters set forth in this Agreement; and it cannot be altered or amended except by an instrument in writing, signed by Buyer and Seller.

29.    CONSTRUCTION. This Agreement is the result of negotiations between the Parties, neither of whom has acted under any duress or compulsion, whether legal, economic or otherwise. Accordingly, the terms and provisions of this Agreement must be construed in accordance with their usual and customary meanings. Seller and Buyer hereby waive the application of any rule of law, which otherwise would be applicable in connection with the construction of this Agreement, that ambiguous or conflicting terms or provisions should be construed against the party who (or whose attorney) prepared the executed Agreement or any earlier draft of this Agreement.

30.    INTERPRETATION. If there is any specific and direct conflict between, or any ambiguity resulting from, the terms and provisions of this Agreement and the terms and provisions of any other document, instrument or agreement executed in connection with or in furtherance of this Agreement, including any exhibits to this Agreement, the other document, instrument or agreement must be consistently interpreted in a manner as to give effect to the general purposes and intention as expressed in this Agreement, which must be deemed to prevail and control.

31.    HEADINGS. The headings in this Agreement are for reference only and do not limit or define the meaning of any provision of this Agreement.

32.    NO THIRD PARTY BENEFICIARY. No term or provision of this Agreement or the exhibits to this Agreement is intended to be, nor may any term or provision be construed to be, for the benefit of any person, firm, corporation or other entity not a party to this Agreement (including, without limitation, any broker), and no other person, firm, corporation or entity has any right or cause of action under this Agreement.

33.    SEVERABILITY. If any provision of this Agreement or any portion of any provision of this Agreement is determined to be invalid, illegal or unenforceable, the invalidity, illegality or unenforceability may not alter the remaining portion of such provision, or any other

*NдR*

13

provision of this Agreement, as each provision of this Agreement is deemed severable from all other provisions of this Agreement.

34. TIME OF ESSENCE. Time is of the essence in the performance of this Agreement.

35. INCORPORATION BY REFERENCE. All exhibits to this Agreement are fully incorporated into this Agreement as though set forth in full.

36. 1031 EXCHANGE. Each party agrees to cooperate with the other party to effectuate a 1031 tax-free exchange in connection with the sale and purchase of the Property. In that connection, each party agrees to execute such documents as may reasonably be required by the other party, provided that the requesting party indemnifies, defends and holds the other party harmless from any liability arising from such exchange or such requesting party's inability to obtain the desired tax treatment from such exchange.

37. OFFER TO PURCHASE. This Agreement represents an offer to purchase submitted by Buyer to Seller. Buyer may terminate this offer at any time prior to receiving Seller's written acceptance.

IN WITNESS WHEREOF, Buyer and Seller have executed this Agreement to be effective as of the date first written above.

**BUYER:**

By: _____  - AKA ARVIL E. SWANEY
Name: Arvil "Buck" Swaney
Title: Principal, Millennial Development Partners, LLC
Date: 4/21/2017

**SELLER:**

By: _____
Name: Veda J. Rupp
Title: Owner & Trustee – Veda J. Rupp Revocable Living Trust
Date: 4/2/17

By: _____
Name: Christine R. Petersen
Title: Trustee – Harold L. Rupp Sr. Trust
Date: 04/07/2017

14

By: _H. Lavelle Rupp J._

Name: H. Lavelle Rupp Jr.

Title: Trustee – Harold L. Rupp Sr. Trust

Date: _4- 7- 2017_



STATE OF UTAH        )

                     ) SS:

COUNTY OF _Salt Lake_ )

Personally came before me this __21__ day of April, 2017, the above named ARVIL "BUCK" SWANEY, to me known to be the person who executed the foregoing instrument as the Principal or Managing Member of the Buyer Millennial Development Partners, LLC, and acknowledged the same.

NOTARY PUBLIC
LINDA R ANDERSON
679261
COMMISSION EXPIRES
SEPTEMBER 11, 2018
STATE OF UTAH

Notary Public: _____

_Salt Lake_ County, Utah

My Commission Expires: _9-11-18_



STATE OF IDAHO       )

                     ) SS:

COUNTY OF BANNOCK    )

Personally came before me this __7__ day of April, 2017, the above named VEDA J. RUPP, to me known to be the person who executed the foregoing instrument as the Owner & Trustee of the Veda J. Rupp Revocable Living Trust, and acknowledged the same.

Notary Public: _____

Bannock County, Idaho

My Commission Expires: ~~My Commission Expires~~

CHANTAE ALLYN SMITH
Notary Public
State of Idaho

My Commission Expires
April 18, 2022

15

**EXHIBIT "A"**

**Page 15 of 19**

STATE OF IDAHO   )
          ) SS:
COUNTY OF BANNOCK )

Personally came before me this ___ day of April, 2017, the above named CHRISTINE R. PETERSEN, to me known to be the person who executed the foregoing instrument as the Trustee of the Harold L. Rupp Sr. Trust, and acknowledged the same.

Notary Public:
Bannock County, Idaho
My Commission Expires: _____ My Commission Expires
                April 18, 2022

CHANTAE ALLYN SMITH
Notary Public
State of Idaho

STATE OF IDAHO   )
          ) SS:
COUNTY OF BANNOCK )

Personally came before me this ___ day of April, 2017, the above named H. LAVELLE RUPP JR., to me known to be the person who executed the foregoing instrument as the Trustee of the Harold L. Rupp Sr. Trust, and acknowledged the same.

Notary Public:
Bannock County, Idaho
My Commission Expires: _____ My Commission Expires
                April 18, 2022

CHANTAE ALLYN SMITH
Notary Public
State of Idaho

16

**EXHIBIT "A"**
**Page 16 of 19**

EXHIBIT A: PROPERTY





1

EXHIBIT B: PROPERTY AND DEPENDENT PROPERTIES



**EXHIBIT "A"**
**Page 18 of 19**

## EXHIBIT A: PROPERTY



*CONFIDENTIAL*

## CONSTRUCTION COOPERATIVE AGREEMENT

### PROJECT NO. _____
### NORTHGATE INTERCHANGE
### BANNOCK COUNTY, IDAHO

This CONSTRUCTION COOPERATIVE AGREEMENT ("Agreement") is made and entered into this 14th day of August, 2017 ("Effective Date"), by and among the IDAHO TRANSPORTATION DEPARTMENT ("ITD"), BANNOCK COUNTY ("County"), the CITY OF POCATELLO ("Pocatello"), the CITY OF CHUBBUCK ("Chubbuck"), the POCATELLO DEVELOPMENT AUTHORITY ("PDA"), and MILLENNIAL DEVELOPMENT PARTNERS ("Developer"). Collectively, these entities may be referred to as the "Parties"; the County, PDA, Pocatello and Chubbuck may jointly be referred to as the "Local Governmental Entities" (i.e., apart from the Developer and ITD). The Federal Highway Administration ("FHWA") is not a party to this Agreement, but may provide certain input or approvals as referenced herein.

### RECITALS AND AGREEMENT

A.    The Parties intend to cooperate in a public-private partnership so as to complete the design and construction of (i) the Northgate Interchange on Interstate 15 in Bannock County, Idaho, and (ii) certain local roads, also in Bannock County, on both the west and east sides of the interchange so as to provide connecting access to and from the interchange and existing state and local roadways. The Northgate Interchange will hereinafter be referred to as the "Interchange"; the new local roads will be referred to as the "Local Roads." Together, the Interchange and Local Roads constitute the "Project" that is the subject of this Agreement. The Parties believe that the Project is desirable to mitigate current congestion and future impacts to the state and local transportation system, and to provide safe, adequate and efficient transportation access. The Parties agree that the Project is in the public interest.

B.    Subject to applicable federal control of interstate highways, ITD has jurisdiction over highways within the State of Idaho. ITD has previously studied and programmed construction of the Interchange. ITD will be the owner and contracting entity for the Interchange. ITD will not be the contracting entity for the Local Roads. However, because it is imperative that the Local Roads provide timely access to the Interchange, the Local Governmental Entities and the Developer are committed via this Agreement to construct the Local Roads so as to provide access by or before the Interchange is completed.

C.    The Project requires the acquisition of additional right-of-way for both the Interchange and Local Roads. As specified herein, Chubbuck has or will acquire certain right-of-way on the west side of Interstate 15. Apart from the right-of-way acquired by Chubbuck, Developer asserts that it is responsible for and has acquired the necessary right-of-way, and will obtain whatever other right-of-way may be required as the Project proceeds. In the event that Chubbuck or any of the other Local Governmental Entities own, obtain, or control any right-of-way needed for the Interchange, that entity will transfer the Interchange right-of-way to ITD before ITD begins Interchange construction.

**EXHIBIT "B"**
**Page 1 of 13**

*CONFIDENTIAL*

D.   The Parties enter into this Agreement to expedite funding, design and construction of the Project. The Parties intend for ITD to accept ownership, jurisdiction and control of all right-of-way associated with the Interchange, including on- and off-ramps subject to ITD's access controls. The Parties also intend for Pocatello and Chubbuck to accept respective ownership, jurisdiction and control of the right-of-way outside of the referenced ITD right-of-way, for the purpose of providing connection via the Local Roads to both the west and east sides of the Interchange (Chubbuck will have jurisdiction over the right-of-way and Local Roads on the west side of the Interchange; Pocatello will have jurisdiction over the right-of-way and Local Roads on the east side of the Interchange upon annexation).

E.   This Agreement sets forth certain terms and conditions regarding the Parties' respective Project efforts, all of which shall be in accordance with the provisions of this Agreement and in accordance with applicable laws, rules, regulations and specifications.

F.   The Parties intend that Project design and engineering begin in 2017, and that reasonable efforts be made to complete the Project in an expedited manner. The Parties intend for Project completion to occur in 2018; however, there is no specific completion deadline applicable to ITD.

G.   The Parties are authorized to enter into this Agreement pursuant to Idaho law, including but not limited to Idaho Code § 40-317.

NOW THEREFORE, for and in consideration of the mutual covenants and consideration in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## SECTION 1.
### GENERAL OBLIGATIONS

1.1   Project Development. The Project shall be completed generally in accordance with the terms and conditions in this Agreement.

1.2   Definition of Project Costs. For purposes of this Agreement, the term "Project Costs" means and includes any and all costs directly associated with the Project.

1.3   Interchange Funding. ITD has sole discretion as to the type of contracting process that will be followed for Interchange construction. The Interchange, as a public-private partnership, depends on full funding being available in a timely manner. ITD reserves the sole right to determine whether adequate funding is available and whether a contract will actually be entered into for construction of the Interchange. ITD cannot agree to partial or insufficient funding that may lead to an unfinished Interchange. To insure adequate funding, the Parties agree as follows:

1.3.1   ITD Funding. Pursuant to this Agreement, ITD agrees to provide funding for the Interchange in an amount no less than $5,000,000. ITD will not contribute funding for the Local Roads portion of the Project. At its sole discretion, ITD may contribute additional funding and/or non-funding contributions for Interchange completion.

CONSTRUCTION COOPERATIVE AGREEMENT                Page 2 of 13

CONFIDENTIAL

1.3.2   <u>Developer Funding</u>. The Developer's monetary contribution for the Interchange will be no less than $3,400,000. Any Interchange funding from the Developer will be deemed a donation as that term is used in Idaho Code § 40-317. Developer may increase its contribution if determined to be necessary for completion of the Interchange. The Developer's $3,400,000 monetary contribution is separate and in addition to any amounts Developer has or will incur in acquiring right-of-way related to any aspect of the Project. Note that section 2.5 of this Agreement also requires Developer to provide and maintain a letter of credit until such time as the Developer submits the cash contribution required by this section.

1.3.3   <u>Total Needed Funding Dependent on Accepted Bid</u>. In accordance with ITD's contracting process, an overall cost for the Interchange will be established via contract(s). In the event that such contracting costs exceed $8,400,000 ($5,000,000 from ITD and $3,400,000 from Developer) ITD will have full and sole discretion to determine if Interchange construction proceeds. If ITD decides to proceed, additional funding may be received from ITD, the Developer or the Local Governmental Entities.

1.4   <u>Funding and Other Requirements that Must be Met Prior to Execution of Interchange Construction Contract</u>. At the conclusion of ITD's Request for Proposal process, but prior to ITD entering into any contract for the construction of the Interchange, the following must occur:

1.4.1   Developer's $3,400,000 contribution must be provided and fully available to ITD. This is a cash contribution that is separate and apart from Developer's contributions to the Local Roads or to its right-of-way acquisitions for any portions of the Project.

1.4.2   With the exception of the Chubbuck right-of-way referenced in section 3.3.2, Developer shall provide sufficient evidence to ITD that the Developer has acquired the necessary right-of-way for the entire Project, and that the FHWA has issued written approval regarding the right-of-way acquisition process and costs.

1.4.3   Developer or the Local Governmental Entities shall have formally transferred the Interchange right-of-way to ITD, with such property being free of any liens or other encumbrances. Any right-of-way provided by the Developer may be deemed a donation pursuant to Idaho Code § 40-317, but is separate and apart from Developer's $3,400,000 cash contribution.

1.4.4   The respective Local Governmental Entities shall have signed and enforceable contracts for the construction of all Local Roads related to the Project. Fully executed copies of each construction contract shall be provided to ITD, and shall specify that completion of the respective Local Roads will occur by or before the scheduled completion of the Interchange.

**EXHIBIT "B"**
**Page 3 of 13**

*Confidential*

1.5 <u>Funding Order and Timing of Contributions for the Interchange</u>.   ITD and the Developer understand and agree as follows:

1.5.1 Developer's contribution of $3,400,000 will be the "first in" contribution for covering costs related to construction of the Interchange.  The Developer shall make this contribution in cash, directly to ITD, no later than the time in which the Request for Proposal of the construction is complete and before ITD accepts such proposal.

1.5.2 ITD's $5,000,000 commitment will be the "second in" for covering Interchange costs and will be committed by ITD promptly after Developer makes its contribution.

1.5.3 If additional funding is needed to enter into a contract for the construction of the Interchange, ITD, the Developer, or the Local Governmental Entities will expeditiously contribute such as agreed to at that time.  It is understood by all the Parties that ITD will not execute a contract to construct the Interchange until full funding for the Interchange has been provided.

1.5.4 Upon receipt of this additional funding, ITD will pursue contract execution with the successful bidder.

1.5.5 In the event that the Developer requests any Interchange modifications that lead to change orders or other increased costs, Developer agrees to increase its contribution so as to cover such change orders/increased costs.  Similarly, if change orders or other increased costs are at the request of ITD or the Local Governmental Entities, the respective requesting entity will increase its contribution so as to cover such change orders/increased costs.

1.6 <u>ITD's Additional Project Related Expenses</u>.  As further contribution to the Interchange, ITD agrees to absorb staff time related to the following expenses: review or respond to any traffic, transportation or impact studies, aiding the Developer to review or respond to appraisals or right-of-way acquisition issues, and provide inspections and other typical ITD project oversight.

1.7 <u>Local Roads Funding</u>.  The Local Roads include the Olympus Drive-to-Interchange roadway connection (east of the Interchange) and the Siphon Road-to-Interchange roadway connection (west of the Interchange).  The Olympus Drive-to-Interchange roadway connection includes a northward extension of Olympus Drive and construction of the Northgate Parkway from Olympus Drive to the Interchange.  The Siphon Road-to-Interchange roadway connection includes a roadway extension of Siphon Road that connects with Hiline Road.  The Local Governmental Entities and Developer will separately coordinate the specific funding for the Local Roads.  Via this Agreement, the Developer and the Local Governmental Entities agree to ensure that the Local Roads are completed and usable by or before the Interchange is scheduled for completion.  In the event that ITD reasonably believes that the Local Roads on the west and/or east sides of the Interchange will not be completed and

CONSTRUCTION COOPERATIVE AGREEMENT                    Page 4 of 13

**EXHIBIT "B"**
**Page 4 of 13**

CONFIDENTIAL

usable by the time the Interchange is scheduled for completion, Developer and the Local Governmental Entities will provide whatever Local Roads' funding is needed to ensure timely completion of the Local Roads. For the Olympus Drive-to-Interchange portion, Developer acknowledges that such may require additional funding by the Developer, and that such will be promptly provided so as to timely complete connection to the Interchange. All construction bonding protection provided to ensure completion of any of the Local Roads, shall name ITD as an additional bond-protected entity.

1.8   Governmental Approvals. The Parties shall cooperate as necessary to obtain any governmental approvals needed for the Project. ITD shall have no obligation to pay for or obtain governmental approvals related to the Local Roads. The Local Governmental Entities shall have no obligation to pay for or obtain governmental approvals related to the Interchange.

1.9   Regulations. All work on the Project shall be performed in accordance with applicable laws, ordinances, regulations, policies, procedures, and guidelines for state highways and local roads.

1.10   Access to Information by ITD and the Local Governmental Entities. Developer shall provide ITD and the Local Governmental Entities with access to all previously-completed designs, plans, specifications, reports, data and other materials (both electronic and hard copy) produced by Developer and its agents and contractors prior to this Agreement.

1.11   Environmental Matters. The Parties shall cooperate as necessary to comply with environmental regulations applicable to the Project.

1.12   Right-of-Way Acquisition and Dedication. With the exception of the Chubbuck right-of-way referenced in section 3.3.2, Developer shall acquire all right-of-way necessary for the Project (Developer asserts that it has already acquired the needed right-of-way, but acknowledges its sole responsibility for obtaining any and all additional right-of-way if determined necessary by ITD or the Local Governmental Entities). Developer shall convey or cause to be conveyed to ITD or the respective Local Governmental Entities, by easement, deed or dedication, as appropriate, such ownership or easement rights for all right-of-way land necessary for the Project. Notwithstanding any other provision herein, ITD shall not be required to condemn any right-of-way (at its sole discretion, ITD reserves the right to coordinate or pursue right-of-way acquisition). Upon request by ITD or the Local Governmental Entities, Developer shall promptly provide full documentation so as to demonstrate the cost and process of any right-of-way acquisition. Both the completed Project and the land occupied by the completed Project shall be publicly owned and maintained by ITD or the respective Local Governmental Entities. ITD's Interchange right-of-way will include that property necessary for the Interchange structure, on/off ramps, and typical approaches. This right-of-way will be transferred to ITD by or before the execution of the Interchange construction contract. Developer shall prepare and

**EXHIBIT "B"**
**Page 5 of 13**

provide to ITD and the Local Governmental Entities accurate legal descriptions for all right-of-way obtained for the Project.

1.13   Documentation/Audit.  ITD shall be entitled to rely on the accuracy and completeness of information furnished by Developer; provided, however, that ITD reserves the right, in its sole discretion, from time to time during the term of this Agreement to examine, review, or audit the books and records of Developer to verify Developer's information submitted to ITD, and Developer agrees to reasonably cooperate. Without limitation, ITD's right to audit and documentation extends to Developer's right-of-way process, including any agreements reached and all costs incurred.  In this regard, Developer shall keep full and detailed accounts and exercise such controls as may be reasonably necessary for proper financial management of the Project. Nothing contained herein shall relieve the Developer of responsibility to provide accurate, complete and detailed records.

1.14   No Representations and Warranties by ITD.  Developer acknowledges to ITD, notwithstanding any other provision of this Agreement, as follows:  (i) any future applications or requests to ITD will be governed by rules and regulations of ITD in effect at the time of such request; (ii) nothing in this Agreement shall be construed to allow Developer any waiver or relief from any of the processes, rules and regulations Developer must follow and comply with to obtain any future approvals from ITD; (iii) nothing in this Agreement shall be construed to create any monetary liability against ITD for damages; and (iv) nothing in this Agreement shall be construed to provide any claim or benefit to a third party.

## SECTION 2.
## DESIGN AND CONSTRUCTION PROCESS

2.1   Design and Construction of Local Roads.  Developer and the Local Governmental Entities will separately coordinate design and construction of the respective Local Roads.  ITD will not be the contracting entity for contracts related to the design or construction of the Local Roads.  The Developer or the Local Governmental Entities, however, will provide ITD with copies of contracts and drawings related to the design and construction of the Local Roads.  As required by federal, state or local law, necessary approvals will be obtained by the Developer and/or the Local Governmental Entities from FHWA, ITD or other applicable governmental entities. ITD does have enforcement authority, per this Agreement, to require completion of the Local Roads, or to take other reasonable actions so as to ensure that the Interchange has access via the Local Roads by the time the Interchange is scheduled for completion.

2.2   Design and Construction of Interchange.  Developer has initiated some design related to the Interchange, and such may be incorporated as the design is completed.  All engineering and design shall comply with ITD's design codes and applicable requirements.  ITD will make an independent decision as to the preferred design and construction procurement process prior to initiating a formal Request for Proposals. The contracting procurement process is anticipated to result in a contract for

CONSTRUCTION COOPERATIVE AGREEMENT                    Page 6 of 13

CONFIDENTIAL

Interchange construction. After completion of a preliminary design for the Interchange, ITD has complete and sole discretion as to whether Interchange final design and construction will proceed.

2.3   Contract Provisions. The construction contract for the Interchange will include those provisions typically included in ITD's standard contracts. Without limitation, these may include bonding requirements, public works licensing requirements, inspection and correction provisions, completion deadlines, insurance protections, indemnification obligations, environmental compliance requirements, and warranty protection.

2.4   Conditions Precedent to Execution of the Construction Contract. All conditions listed in Sections 1.4 and 1.5 of the Agreement shall be satisfied prior to execution of the construction contract.

2.5   Letter of Credit. So as to ensure Developer's subsequent $3,400,000 cash contribution for the Interchange, Developer shall, within 60 days of the execution of this Agreement, deliver to ITD an irrevocable and unconditional letter of credit in favor of ITD in an amount no less than $3,400,000. The letter of credit shall be issued by either a national bank with a branch in Idaho or another financial institution acceptable to ITD. Developer's letter of credit shall be released promptly after Developer provides its $3,400,000 cash contribution as specified in section 1.3.2.

2.6   Finalizing the Interchange Design. ITD will prepare a preliminary and subsequent final design for the Interchange. ITD has sole discretion as to the final design of the Interchange. ITD and the Developer acknowledge that design modifications may occur if required by ITD's interstate design standards or by the FHWA. In the event that ITD and Developer disagree as to requested changes in the design, the dispute will be referred to ITD's Chief Operating Officer for analysis and decision.

## SECTION 3.
## COUNTY, POCATELLO/PDA, AND CHUBBUCK INVOLVEMENT

3.1   Bannock County Involvement and Obligations. The County shall:

3.1.1   In conjunction with the Developer and the other Local Governmental Entities, ensure that the Local Roads within the County's jurisdiction will be completed by or before the scheduled completion of the Interchange. Specifically, this will include coordination with Pocatello and the Developer to fund, design, and construct the Olympus Drive-to-Interchange roadway connection, and coordination with Chubbuck to fund, design, and construct the Siphon Road-to-Interchange roadway connection.

3.1.2   Collaborate with Pocatello and the PDA to develop and execute a transfer of powers ordinance, if needed, which would allow for establishment of an Urban Renewal Area, with revenue allocation districts within unincorporated Bannock County.

**EXHIBIT "B"**
**Page 7 of 13**

CONFIDENTIAL

3.1.3   In fiscal year 2017, provide up to $350,000 towards the immediate design and construction of the Olympus Drive-to-Interchange roadway connection together with in-kind resources for earthmoving work.

In fiscal year 2018, provide up to $1,000,000 towards the immediate design and construction of the Olympus Drive-to-Interchange roadway connection.

3.2   City of Pocatello/Pocatello Development Authority Involvement and Obligations.

3.2.1   In conjunction with the Developer and the other Local Governmental Entities, the City of Pocatello will ensure that the Local Roads within Pocatello's jurisdiction will be completed by or before the scheduled completion of the Interchange. Specifically, this will include coordination with the County and Developer to fund, design and construct the Olympus Drive-to-Interchange roadway connection, and construct and deliver water and sewer infrastructure and services to the intersection of Olympus Drive and Northgate Parkway.

3.2.2   The City of Pocatello shall provide $500,000 to fund the engineering, surveying, and construction staking for the extension of Olympus Drive up to its intersection with Northgate Parkway.

3.2.3   Notwithstanding any of the other terms contained in this Agreement, the involvement and obligation of Pocatello Development Authority with respect to the Project shall be limited to providing an amount up to and not greater than $2,000,000 for road and infrastructure improvements from Olympus Drive to the Interchange.

3.2.4   The City of Pocatello shall accept full control and jurisdiction of the right-of-way, newly constructed roads, and associated facilities for connections within Pocatello. This will include the road from the Interchange to Olympus Drive (unless otherwise within ITD's jurisdiction and control for all such properties/roads).

3.3   City of Chubbuck Involvement and Obligations. Chubbuck shall:

3.3.1   In conjunction with the Developer and the other Local Governmental Entities, ensure that the Local Roads within Chubbuck's jurisdiction will be completed by or before the scheduled completion of the Interchange. Specifically, this will include coordination with the County to fund, design, and construct the Siphon Road-to-Interchange roadway connection.

3.3.2   Obtain all required right-of-way for the Local Roads within Chubbuck's jurisdiction, as well as that right-of-way located on the west side of the Interstate that will be needed for the Interchange (i.e., property necessary for Interchange ramps, etc.). Prior to ITD's construction of the Interchange, Chubbuck agrees to convey to ITD, by easement, deed or dedication, as appropriate, all Interchange right-of-way that is owned or acquired by Chubbuck.

EXHIBIT "B"
Page 8 of 13



CONFIDENTIAL

3.3.3  Provide $3,500,000 for roadway construction and access along the Siphon Road-to-Interchange connecting road.   Fund the engineering, surveying, and construction staking for the connection of Siphon Road to the Interchange.  These funds are available and have already been approved for the project.

3.3.4  Provide up to $1,500,000 for additional utility infrastructure or other project costs. Construct and deliver water, sewer, and other infrastructure and services from the Siphon Road/Hiline Road intersection to the Interchange.   These funds are currently available.

3.3.5  Accept full control and jurisdiction of the right-of-way, newly constructed roads, and associated facilities for connections within Chubbuck.  This will include the road from the Interchange to Siphon Road (unless otherwise within ITD's jurisdiction and control for all such properties/roads).

<div align="center">

**SECTION 4.**
**REMEDIES**

</div>

4.1  Default.  No Party shall be deemed to be in default under this Agreement except upon the expiration of thirty (30) days after receipt of written notice from another Party specifying the particulars in which such Party has failed to perform its obligations under this Agreement ("Notice of Default"), unless such Party, prior to expiration of said thirty (30) day period, has rectified the particulars specified in the Notice of Default.  If the cure is not one that is capable of being completed within such thirty (30) day period but is commenced within such thirty (30) day period and is being diligently prosecuted, then there shall be no default.

4.2  Default by Developer.  If Developer defaults beyond the expiration of the cure period as provided above in Section 4.1, (i) ITD is specifically authorized at its discretion to enforce the letter of credit required by Section 2.5, and (ii) ITD may exercise any other remedies to which it is entitled.

4.3  Default by ITD or the Local Governmental Entities.   Apart from their respective financial contributions as specified in this Agreement, if ITD or the Local Governmental Entities default in the performance of their respective obligations under the terms and provisions of this Agreement, Developer shall only be entitled to non-monetary remedies, such as specific performance, declaratory relief, and injunctive relief.  In the event that ITD declines to initiate construction of the Interchange, Developer is entitled to the return of its $3,400,000 contribution referenced in section 1.3.2.

4.4  Attorneys' Fees.  Should any Party find it necessary to employ an attorney for representation in any action seeking enforcement of any of the provisions of this Agreement, the unsuccessful Party (or Parties) in any final judgment or award entered therein shall reimburse the prevailing Party for all reasonable costs, charges and expenses, including reasonable attorneys' fees expended or incurred by the prevailing

CONFIDENTIAL

Party in connection therewith and in connection with any appeal, and the same may be included in such judgment or award.

### SECTION 5.
### OTHER PROVISIONS

5.1  <u>Notices</u>. All notices, requests, consents, approvals, payments in connection with this Agreement, or communications that the Parties desire or are required or permitted to give or make to any other Party under this Agreement shall only be deemed to have been given, made and delivered, when made or given in writing and personally served, or deposited in the United States mail, certified or registered mail, postage prepaid, or sent by reputable overnight courier (e.g., FedEx) and addressed to the Party's designated representative identified below:

ITD

Ed Bala
D-5 District Engineer
Ed.bala@itd.idaho.gov
(208) 239-3327
5151 South 5th Avenue
Pocatello, ID 83204

BANNOCK COUNTY

Tiffany G. Olsen
Administrative Manager
Office of the Board
of County Commissioners
tiffanyo@bannockcounty.us
(208) 236-7211
624 E. Center, Room 103
Pocatello, ID 83201

CITY OF POCATELLO

Jeffrey L. Mansfield, PE
Public Works Director/City Engineer
jmansfield@pocatello.us
(208) 234-6212
911 N 7th Avenue
Pocatello, ID 83201

CITY OF CHUBBUCK

Rodney Burch
Public Works Director
rburch@cityofchubbuck.us
(208) 237-2430
PO Box 5604
Chubbuck, ID 83202

CONSTRUCTION COOPERATIVE AGREEMENT                    Page 10 of 13

**EXHIBIT "B"**
**Page 10 of 13**

CONFIDENTIAL

| POCATELLO DEVELOPMENT AUTHORITY | Melanie Gygli<br>Executive Director<br>mgygli@pocatello.us<br>(208) 234-6583<br>c/o City of Pocatello<br>PO Box 4169<br>Pocatello, ID 83205 |
| --- | --- |
| MILLENNIAL DEVELOPMENT PARTNERS | Buck Swaney<br>buckswaney@gmail.com<br>(801) 694-4279<br>1685 E. Haven Brook Cir<br>Salt Lake City, UT 84121 |

Notice shall be deemed given upon actual receipt (or attempted delivery if delivery is refused), if personally delivered or rejected. Any Party may designate a new or substitute representative by so notifying the other Parties as specified in this Section.

5.2   Force Majeure. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefore, civil commotion, fire or other casualty, and other causes beyond the reasonable control of the Party obligated to perform, shall excuse the performance by such Party for a period equal to any such prevention, delay or stoppage.

5.3   Choice of Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Idaho.

5.4   Jurisdiction. The state courts of the State of Idaho shall have exclusive jurisdiction of any suit, dispute, claim, demand, controversy, or cause of action that the Parties may now have or at any time in the future claim to have based in whole or in part or arising from the negotiations, execution, interpretation, or enforcement of this Agreement. The Parties submit to the in personam jurisdiction of the State, to venue in the state courts within the State, and consent to service of process being effected upon them by certified mail sent to the addresses set forth in this Agreement.

5.5   Entire Agreement. This Agreement constitutes the full and entire understanding and agreement between the Parties with regard to the transaction contemplated herein, and no Party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements, whether written or oral, except as specifically set forth herein.

5.6   Acknowledgments and Modifications. No acknowledgments required hereunder, and no modification or waiver of any provision of this Agreement or consent to departure therefrom, shall be effective unless in writing and signed by each Party hereto. In the event that all or any part of this Agreement is judicially found or declared to be

**EXHIBIT "B"**
**Page 11 of 13**

CONFIDENTIAL

unenforceable or contrary to applicable law, the Parties agree to modify the terms hereof to the slightest extent possible to cause the Agreement to be enforceable and consistent with applicable law.

5.7   <u>Headings</u>.  The headings used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

5.8   <u>Successors and Assigns; Survival</u>.  This Agreement may be assigned only upon written consent of ITD and the Local Governmental Entities, with such consent not being unreasonably withheld.  All provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their heirs, successors and assigns and shall survive any transfer or assignment by a Party or their heirs, successors or assigns.  This Agreement shall remain effective notwithstanding the expiration, cancellation, termination or completion of this Agreement as may be necessary for any Party to enforce the terms and provisions of this Agreement.

5.9   <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, any of which shall be deemed an original but both of which together shall constitute one and the same instrument.

5.10  <u>No Third Party Beneficiary Rights</u>.  This Agreement is not intended to create, nor shall it in any way be interpreted or construed to create, any third party beneficiary rights in any person not a party hereto.

5.11  <u>Time is of the Essence</u>.  Time is of the essence for this Agreement.

5.12  <u>Sufficient Appropriation</u>.  It is understood and agreed that ITD, the County, Pocatello, Chubbuck and PDA are governmental entities.  Accordingly, this Agreement shall in no way be construed so as to bind or obligate ITD or the Local Governmental Entities beyond the term of any particular appropriation of funds.

5.13  <u>Effective Date</u>.  This Agreement shall become effective on the first date mentioned above and shall remain in effect until amended or replaced upon the mutual consent of all Parties.

IN WITNESS WHEREOF, the parties have executed this Agreement, effective as of the Effective Date.

IDAHO TRANSPORTATION DEPARTMENT, an executive department of the State of Idaho

By: Brian Ness
Its: DIRECTOR

CONSTRUCTION COOPERATIVE AGREEMENT                    Page 12 of 13

**EXHIBIT "B"**
**Page 12 of 13**

CONFIDENTIAL

BANNOCK COUNTY:

By: Evan S. Frasure
Its: Chairman

CITY OF POCATELLO:

By: Brian C. Blad
Its: Mayor

CITY OF CHUBBUCK:

By: Kevin England
Its: Mayor

POCATELLO DEVELOPMENT AUTHORITY:

By: Scott J. Smith
Its: Chairman

DEVELOPER:
MILLENNIAL DEVELOPMENT PARTNERS

By: ARVIL BUCK SWANEY
Its: PRINCIPAL

CONSTRUCTION COOPERATIVE AGREEMENT          Page 13 of 13

**EXHIBIT "B"**
**Page 13 of 13**

OFFICIAL RECORDS BK# 1039    FEE 46.00 DEPUTY DM
BANNOCK COUNTY IDAHO          RECORDED AT REQUEST OF
Pioneer Title Pocatello

21714229    2017 Sep 28 PM 02:51:00
Electronically Recorded by Simplifile


**PioneerTitleCo.**
*GOING BEYOND*

135 N. Arthur Ave.
Pocatello, ID 83204

**ELECTRONICALLY RECORDED-DO NOT
REMOVE THE COUNTY STAMPED FIRST
PAGE AS IT IS NOW INCORPORATED AS
PART OF THE ORIGINAL DOCUMENT**

File No. 620088  SK/MH

## WARRANTY DEED

For Value Received

Harold L. Rupp Sr. Trust with Christine R. Petersen and H. Lavelle Rupp Jr., Trustees, as to a 50% interest andThe Veda J. Rupp Revocable Living Agreement of Trust (Amended), with Christine R. Petersen and Harold Lavelle Rupp Jr., as Trustees, as to a 50% interest

hereinafter referred to as Grantor, does hereby grant, bargain, sell, warrant and convey unto

Millennial Development Partners, LLC, a Utah limited liability company

hereinafter referred to as Grantee, whose current address is

1685 East Haven Brook Circle Salt Lake City, UT 84121

The following described premises, to-wit:

EXHIBIT "A" ATTACHED

To HAVE AND TO HOLD the said premises, with their appurtenances unto the said Grantee(s), and Grantees(s) heirs and assigns forever. And the said Grantor(s) does (do) hereby covenant to and with the said Grantee(s), the Grantor(s) is/are the owner(s) in fee simple of said premises; that said premises are free from all encumbrances EXCEPT those to which this conveyance is expressly made subject and those made, suffered or done by the Grantee(s); and subject to U.S. Patent reservations, restrictions, dedications, easements, rights of way and agreements, (if any) of record, and current years taxes, levies, and assessments, includes irrigation and utility assessments, (if any) which are not yet due and payable, and that Grantor(s) will warrant and defend the same from all lawful claims whatsoever.

Dated:  September 27, 2017

The Harold L. Rupp Sr. Trust

By: *Christine R. Petersen*                    By: *Harold Lavelle Rupp Jr.*
Christine R. Petersen,  Co-Trustee                Harold Lavelle Rupp, Jr., Co-Trustee

The Veda J. Rupp Revocable Living Agreement of Trust (Amended)

By: *Christine R. Petersen*                    By: *Harold Lavelle Rupp Jr.*
Christine R. Petersen, Co-Trustee                Harold Lavelle Rupp, Jr., Co-Trustee

**EXHIBIT "C"**
**Page 1 of 5**

State of IDAHO, County of BANNOCK

On this 28th day of SEPTEMBER in the year of 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared CHRISTINE R. PETERSEN and H. LAVELLE RUPP, JR. as Co-Trustee(s) of The Harold L. Rupp Sr. Trust known or identified to me to be the person/persons whose name(s) is/are subscribed to the within instrument as said Trustee(s), and acknowledged to me that he/she/they executed the same as Co-Trustee(s) of said trust and as his/her/their free and voluntary act and deed of said trust, for the uses and purposes therein mentioned.

STACY M. KONO
NOTARY PUBLIC of IDAHO
Residing at: POCATELLO, ID
Commission Expires: 03/09/21



State of IDAHO, County of BANNOCK

On this 28th day of SEPTEMBER in the year of 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared CHRISTINE R. PETERSEN and HAROLD LAVELLE RUPP, JR., as Co-Trustee(s) of THE VEDA J. RUPP REVOCABLE LIVING AGREEMENT OF TRUST (AMENDED) known or identified to me to be the person/persons whose name(s) is/are subscribed to the within instrument as said Co-Trustee(s), and acknowledged to me that he/she/they executed the same as Trustee(s) of said trust and as his/her/their free and voluntary act and deed of said trust, for the uses and purposes therein mentioned.

STACY M. KONO
NOTARY PUBLIC of IDAHO
Residing at: POCATELLO, ID
Commission Expires: 03/09/21

**EXHIBIT "C"**
**Page 2 of 5**

# EXHIBIT A

PARCEL 1:

A TRACT OF LAND LOCATED IN THE NORTHEAST 1/4 OF SECTION 2, TOWNSHIP 6 SOUTH, RANGE 34 EAST, AND THE SOUTHEAST 1/4 OF SECTION 35, TOWNSHIP 5 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BANNOCK COUNTY, IDAHO, BEING A PORTION OF THE LANDS DESCRIBED IN CORRECTED QUITCLAIM DEED RECORDED AS INSTRUMENT NO. 21514114 IN THE OFFICIAL RECORDS OF BANNOCK COUNTY DESCRIBED AS FOLLOWS:

COMMENCING AT THE WEST 1/4 CORNER OF SECTION 1, BEING MARKED BY A 1" IRON ROD WITH NO CAP AS DESCRIBED IN CORNER PERPETUATION AND FILING RECORDED AS INSTRUMENT NO. 20520359 IN THE OFFICIAL RECORDS OF BANNOCK COUNTY, FROM WHICH THE CENTER 1/4 CORNER OF SECTION 1 BEARS SOUTH 89°54'39" EAST A DISTANCE OF 2629.33 FEET;

THENCE NORTH 0°38'28" WEST, ALONG THE WEST LINE OF SECTION 1, A DISTANCE OF 1624.95 FEET TO THE POINT OF BEGINNING;

THENCE NORTH 0°38'28" WEST, CONTINUING ALONG THE WEST LINE OF SECTION 1, A DISTANCE OF 153.15 FEET;

THENCE NORTH 78°59'42" WEST A DISTANCE OF 75.51 FEET TO A POINT OF TANGENCY WITH A 500.00 FOOT RADIUS CURVE WHOSE CENTER BEARS NORTH 11°00'18" EAST;

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN A NORTHWESTERLY DIRECTION THROUGH A CENTRAL ANGLE OF 48°40'36" FOR AN ARC LENGTH OF 424.78 FEET (THE CHORD OF SAID CURVE BEARS NORTH 54°39'24" WEST A DISTANCE OF 412.12 FEET) TO A POINT OF TANGENCY;

THENCE NORTH 30°19'06" WEST A DISTANCE OF 201.23 FEET TO A POINT OF TANGENCY WITH A 1000 FOOT RADIUS CURVE WHOSE CENTER BEARS NORTH 59°40'54" EAST;

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN A NORTHERLY DIRECTION THROUGH A CENTRAL ANGLE OF 35°53'28" FOR AN ARC LENGTH OF 626.42 FEET (THE CHORD OF SAID CURVE BEARS NORTH 12°22'22" EAST A DISTANCE OF 616.23 FEET) TO A POINT OF TANGENCY WITH THE EASTERLY RIGHT-OF-WAY LINE OF INTERSTATE 15 AS DEFINED IN FEDERAL AID PROJECT I-15-2(1)72, SAID POINT BEING A POINT OF CUSP;

THENCE SOUTH 5°34'22" WEST, ALONG THE EASTERLY RIGHT-OF-WAY LINE OF I-15, A DISTANCE OF 1560.60 FEET TO A POINT OF CUSP WITH A 350.00 FOOT RADIUS CURVE WHOSE CENTER BEARS SOUTH 84°25'38" EAST;

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN A NORTHEASTERLY DIRECTION THROUGH A CENTRAL ANGLE OF 72°20'22" FOR AN ARC LENGTH OF 441.90 FEET (THE CHORD OF SAID CURVE BEARS NORTH 41°44'33" EAST A DISTANCE OF 413.13 FEET) TO A POINT OF TANGENCY;

THENCE NORTH 77°54'44" EAST A DISTANCE OF 341.27 FEET TO A POINT OF TANGENCY WITH A 350.00 FOOT RADIUS CURVE WHOSE CENTER BEARS SOUTH 12°05'16 EAST;

**EXHIBIT "C"**
**Page 3 of 5**

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN AN EASTERLY DIRECTION THROUGH A CENTRAL ANGLE OF 23°05'34" FOR AN ARC LENGTH OF 141.06 FEET (THE CHORD OF SAID CURVE BEARS NORTH 89°27'31" EAST A DISTANCE OF 140.11 FEET) TO A POINT OF TANGENCY;

THENCE SOUTH 78°59'42" EAST A DISTANCE OF 49.22 FEET TO THE POINT OF BEGINNING.

RESERVING THEREFROM:

AN EASEMENT FOR MAINTENANCE OF AN EXISTING IRRIGATION LINE ON THE NORTHERLY 200 FEET OF THE ABOVE DESCRIBED LANDS.


PARCEL 2:

A 150.00 FOOT WIDE STRIP OF LAND LOCATED IN THE NORTHWEST 1/4 OF SECTION 1, TOWNSHIP 6 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BEING A PORTION OF THE LAND DESCRIBED IN DEED INSTRUMENT 21514114, OF THE RECORDS OF BANNOCK COUNTY, IDAHO, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE CENTER 1/4 CORNER OF SECTION 1, BEING MARKED BY A 2 1/2" ALUMINUM CAP STAMPED PLS-10786, AND RECORDED UNDER CORNER PERPETUATION AND FILING RECORD INSTRUMENT 21617873 OF THE RECORDS OF BANNOCK COUNTY, FROM WHICH THE SOUTH 1/4 CORNER OF SAID SECTION 1 BEARS SOUTH 00°14'04" EAST, 2650.48 FEET, THE TRUE POINT OF BEGINNING;

THENCE NORTH 89°54'40" WEST ALONG THE LATITUDINAL CENTERLINE OF SAID SECTION 1 A DISTANCE OF 657.85 FEET, TO A POINT OF NON-TANGENCY OF A 1015.00 FOOT RADIUS CURVE, FROM SAID POINT THE CENTER BEARS NORTH 00°06'49" EAST;

THENCE NORTHWESTERLY ALONG SAID CURVE, THRU A CENTRAL ANGLE OF 62°04'26", AND AN ARC DISTANCE OF 1099.65 FEET, TO A POINT OF TANGENCY;

THENCE NORTH 27°48'45" WEST, A DISTANCE OF 657.80 FEET, TO A POINT OF TANGENCY OF A 925.00 FOOT RADIUS CURVE, FROM SAID POINT THE CENTER BEARS SOUTH 62°11'15" WEST;

THENCE NORTHWESTERLY ALONG SAID CURVE, THRU A CENTRAL ANGLE OF 51°10'57", AND AN ARC DISTANCE OF 826.30 FEET TO A POINT OF TANGENCY;

THENCE NORTH 78°59'42" WEST, A DISTANCE OF 148.17 FEET, TO A POINT ON THE WEST LINE OF SECTION 1;

THENCE NORTH 00°38'28" WEST, ALONG THE WEST LINE OF SECTION 1, A DISTANCE OF 153.15 FEET;

THENCE SOUTH 78°59'42" EAST, A DISTANCE OF 179.09 FEET, TO A POINT OF TANGENCY OF A 1075.00 FOOT RADIUS CURVE, FROM SAID POINT THE CENTER BEARS, SOUTH 11°00'18" WEST;

THENCE SOUTHEASTERLY ALONG SAID CURVE THRU A CENTRAL ANGLE OF 51°10'57", AND AN ARC DISTANCE OF 960.30 FEET, TO A POINT OF TANGENCY;



THENCE SOUTH 27°48'45" EAST, A DISTANCE OF 657.80 FEET, TO A POINT OF TANGENCY OF A 865.00 FOOT RADIUS CURVE, FROM SAID POINT THE CENTER BEARS NORTH 62°11'15" EAST;

THENCE SOUTHEASTERLY ALONG SAID CURVE THRU A CENTRAL ANGLE OF 62°05'55", AND AN ARC DISTANCE OF 937.51 FEET, TO A POINT OF TANGENCY;

THENCE SOUTH 89°54'40" EAST PARALLEL WITH AND 150.00 FEET NORTH OF THE LATITUDINAL CENTERLINE OF SECTION 1, A DISTANCE OF 656.57 FEET, TO A POINT ON THE MERIDIONAL CENTERLINE OF SECTION 1;

THENCE SOUTH 0°14'04" EAST ALONG THE MERIDIONAL CENTERLINE OF SECTION 1 A DISTANCE OF 150.00 FEET TO THE TRUE POINT OF BEGINNING.

**EXHIBIT "C"**
**Page 5 of 5**

8.1
21715051

OFFICIAL RECORD BK#_ 1020
BANNOCK COUNTY IDAHO

RECORDED AT REQUEST OF
FEE __15__ DEPUTY _VH_

 PioneerTitleCo.
GOING BEYOND

PIONEER TITLE

21715051      2017 OCT 12  P 4:16

File No. 631772 /MH

**WARRANTY DEED**

For Value Received    Millennial Development Partners, LLC, a Utah limited liability company and Portneuf Development, LLC, an Idaho limited liability company

hereinafter referred to as Grantor, does hereby grant, bargain, sell, warrant and convey unto

Town Center JV, a General Partnership

hereinafter referred to as Grantee, whose current address is  4990 Valenty Ste. J, Chubbuck, ID 83202

The following described premises, to-wit:

See Exhibit A -E attached hereto and made a part hereof.

To HAVE AND TO HOLD the said premises, with their appurtenances unto the said Grantee(s), and Grantees(s) heirs and assigns forever.  And the said Grantor(s) does (do) hereby covenant to and with the said Grantee(s), the Grantor(s) is/are the owner(s) in fee simple of said premises; that said premises are free from all encumbrances EXCEPT those to which this conveyance is expressly made subject and those made, suffered or done by the Grantee(s); and subject to U.S. Patent reservations, restrictions, dedications, easements, rights of way and agreements, (if any) of record, and current years taxes, levies, and assessments,  includes irrigation and utility assessments, (if any) which are not yet due and payable, and that Grantor(s) will warrant and defend the same from all lawful claims whatsoever.

Dated:  October 2, 2017

Millennial Development Partners, LLC, a Utah limited liability company

By: _____
    Arvil E. "Buck" Swaney, Managing Member

Portneuf Development, LLC, an Idaho limited liability company

By: _____
    Kenneth D. Pape, Chief Executive Manager

By: _____
    Michael R. Jaglowski, PE, Member and Director of Development, Planning and Engineering

**EXHIBIT "D"**
**Page 1 of 8**

State of Idaho, County of Bannock

**21715051**

On this ____11th____ day of October in the year of 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Arvil E. "Buck" Swaney, known or identified to me to be the Managing Member of the Limited Liability Company that executed the foregoing instrument, and acknowledged to me that such Limited Liability Company executed the same.

Residing at: _____Pocatello, ID_____
Commission Expires: ____03/04/21____

State of Idaho, County of Bannock

On this ____10th____ day of October in the year of 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Kenneth D. Pape and Michael R. Jaglowski, known or identified to me to be the Chief Executive Manager and Member and Director of Development, Planning and Engineering of the Limited Liability Company that executed the foregoing instrument, and acknowledged to me that such Limited Liability Company executed the same.

Residing at: Pocatello, ID
Commission Expires: ____03/04/21____

**EXHIBIT "D"**
**Page 2 of 8**

8.3

**21715051**

EXHIBIT A

PARCEL 1
COMMENCING AT THE CENTER QUARTER CORNER OF SECTION 1, TOWNSHIP 6 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BANNOCK COUNTY, IDAHO AND RUNNING THENCE S 39°23'54" E 398.18 FEET; WHICH IS THE POINT OF BEGINNING.
AND RUNNING THENCE N 90°00'00" W 714.72 FEET; THENCE S 01°05'15" W 371.93 FEET; THENCE IN A SOUTHERLY DIRECTION WITH A TANGENT CURVE TURNING TO THE LEFT WITH A RADIUS OF 950.00 FEET, HAVING A CHORD S 06°03'11" E 236.18 FEET, A CENTRAL ANGLE 14°16'53" AND AN ARC LENGTH 236.79 FEET; THENCE N 90°00'00" E 699.36 FEET; THENCE N 00°14'03" W 606.73 FEET; TO THE POINT OF BEGINNING.

PARCEL 2
COMMENCING AT THE CENTER QUARTER CORNER OF SECTION 1, TOWNSHIP 6 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BANNOCK COUNTY, IDAHO AND RUNNING THENCE S 15°35'39" E 949.37 FEET; WHICH IS THE POINT OF BEGINNING.
AND RUNNING THENCE N 90°00'00" W 699.36 FEET; THENCE IN A SOUTHEASTERLY DIRECTION WITH A NON-TANGENT CURVE TURNING TO THE LEFT WITH A RADIUS OF 950.00 FEET, HAVING A CHORD S 23°53'27" E 352.67 FEET, A CENTRAL ANGLE 21°23'39" AND AN ARC LENGTH 354.73 FEET; THENCE IN A SOUTHEASTERLY DIRECTION WITH A REVERSE TANGENT CURVE TURNING TO THE RIGHT WITH A RADIUS OF 2050.00 FEET, HAVING A CHORD S 33°26'40" E 81.83 FEET, A CENTRAL ANGLE 02°17'14" AND AN ARC LENGTH 81.83 FEET; THENCE N 79°06'07" E 522.04 FEET; THENCE N 00°14'03" W 292.04 FEET; TO THE POINT OF BEGINNING.

PARCEL 3
COMMENCING AT THE CENTER QUARTER CORNER OF SECTION 1, TOWNSHIP 6 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BANNOCK COUNTY, IDAHO AND RUNNING THENCE S 89°53'42" E 251.48 FEET; WHICH IS THE POINT OF BEGINNING.
AND RUNNING THENCE N 89°53'42" W 633.91 FEET; THENCE IN A SOUTHWESTERLY DIRECTION WITH A TANGENT CURVE TURNING TO THE LEFT WITH A RADIUS OF 74.98 FEET, HAVING A CHORD S 45°35'18" W 105.14 FEET, A CENTRAL ANGLE 89°02'00" AND AN ARC LENGTH 116.51 FEET; THENCE S 01°05'15" W 234.86 FEET; THENCE N 90°00'00" E 714.72 FEET; THENCE N 00°14'03" W 307.24 FEET; TO THE POINT OF BEGINNING.

**EXHIBIT "D"**
**Page 3 of 8**

8.4

"Exhibit B"                                  **21715051**

Roadway Description thru
Portneuf Development Property

A strip of land located in the Southwest 1/4 of Section 1, Township 6 South, Range 34 East, Boise
Meridian, being a portion of the land described in deed instrument 21612701, of the records of Bannock
County, Idaho, more particularly described as follows:
Beginning at the South 1/4 corner of Section 1, being marked by a 2" aluminum cap in a City of Pocatello
standard vault, and recorded under Corner Perpetuation and Filing Record instrument 800761 of the
records of Bannock County, **THE TRUE POINT OF BEGINNING;**
Thence South 89°53'23" West along the South Line of said Section 1 a distance of 50.00 feet;
Thence North 00°02'30" East, a distance of 248.42 feet, to a point of tangency of a 1950.00 foot radius
curve, from said point the radius bears North 89°57'30" West;

Thence northwesterly along said curve thru a central angle of 34°37'47", and an arc distance of 1178.59
feet, to a point of reverse curvature, from said point the radius bears North 55°24'43" East;
Thence northwesterly along a 1050.00 foot radius curve, thru a central angle of 35°40'32", and an arc
distance of 653.79 feet, to a point of tangency;
Thence North 01°05'15" East, a distance of 577.00 feet, to a point of tangency of a 100.00 foot radius
curve, from said point the radius bears North 88°54'45" West;
Thence Northwesterly along said curve, thru a central angle of 90°58'27", and an arc distance of 158.78
feet to a point of cusp, from said point the radius bears South 00°06'49" West, also said point being on
the latitudinal centerline of Section 1;
Thence South 89d54'40" East, along the latitudinal centerline of Section 1, a distance of 300.00 feet, to a
point of cusp of a 100.00 foot radius curve, whose center bears South 00°05'20" West;
Thence 5outhwesterly along said curve, thru a central angle of 89°00'05", and an arc distance of 155.34
feet, to a point of tangency;
Thence South 01°05'15" West, a distance of 582.23 feet, to a point of tangency of a 950.00 foot radius
curve, from said point the center bears South 88°54'46" East;
Thence Southeasterly along said curve thru a central angle of 35°40'32", and an arc distance of 591.52
feet, to a point of reverse curvature, of a 2050.00 foot radius curve, from said point the radius bears
South 55°24'43" West;
Thence Southeasterly along said curve thru a central angle of 21°31'08", and an arc distance of 769.93
feet, to a point of non-tangency, on the meridional centerline of Section 1, from said point the center
bears, South 76°55'51" West;
Thence South 00°14'04" East along the meridional centerline of Section 1 a distance of 713.28 feet to
**THE TRUE POINT OF BEGINNING.**

**COMPRISING 5.77 ACRES MORE OR LESS**



**EXHIBIT "D"**
**Page 4 of 8**

21715051

"Exhibit C"



**RMES**
Engineers ♦ Surveyors ♦ Planners
301 58th St. W. #138 • Williston, ND 58801 • (701) 572-0110
600 E. Oak St. • Pocatello, ID 83201 • (208) 234-0110
www.rmes.biz

## EXHIBIT A: ROW Parcel Description and Map
LEGAL DESCRIPTION
PARCEL B – HART TO MILLENNIAL DEVELOPMENT GROUP

A TRACT OF LAND SITUATED IN THE SOUTHEAST 1/4 OF SECTION 1, TOWNSHIP 6 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BANNOCK COUNTY, IDAHO DESCRIBED AS FOLLOWS:

**BEGINNING** AT THE SOUTH 1/4 CORNER OF SECTION 1, BEING A 3 INCH BCM PER CORNER PERPETUATION RECORDED AS INST. NO. 20520364 IN THE OFFICIAL RECORDS OF BANNOCK COUNTY, THENCE NORTH 89°54'05" EAST, ALONG THE SOUTH LINE OF SECTION 1, A DISTANCE OF 50.00 FEET;

THENCE NORTH 0°02'30" EAST A DISTANCE OF 248.16 FEET TO A POINT OF CURVATURE OF A 2050.00 FOOT RADIUS CURVE WHOSE CENTER BEARS NORTH 89°57'30" WEST;

THENCE FOLLOWING ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 13°06'37" FOR AN ARC LENGTH OF 469.08 FEET (THE CHORD OF SAID CURVE BEARS NORTH 6°30'49" WEST A DISTANCE OF 468.05 FEET) TO A POINT OF NON-TANGENCY ON THE MERIDIONAL CENTERLINE OF SECTION 1;

THENCE SOUTH 0°14'03" EAST, ALONG THE MERIDIONAL CENTERLINE OF SECTION 1, A DISTANCE OF 713.28 FEET TO THE **POINT OF BEGINNING.**

**RETAINING THEREFROM** AN EASEMENT FOR EXISTING POWER LINES BEING ALONG THE EASTERLY TWENTY FEET, MORE OR LESS, FROM THE ABOVE DESCRIBED PARCEL.

SAID PARCEL CONTAINS 0.68 ACRES, MORE OR LESS.

11777

*Focused on Solutions*

Civil ♦ Environmental ♦ Transportation ♦ Planning ♦ Land Development ♦ Municipal ♦ Surveying

**EXHIBIT "D"**
**Page 5 of 8**

21715051



301 58th St. W. #138 • Williston, ND 58801 • (701) 572-0110
600 E. Oak St. • Pocatello, ID 83201 • (208) 234-0110
www.rmes.biz

"Exhibit D"

LEGAL DESCRIPTION
NORTHGATE INTERCHANGE

A TRACT OF LAND LOCATED IN THE NORTHEAST 1/4 OF SECTION 2, TOWNSHIP 6 SOUTH, RANGE 34 EAST, AND THE SOUTHEAST 1/4 OF SECTION 35, TOWNSHIP 5 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BANNOCK COUNTY, IDAHO, BEING A PORTION OF THE LANDS DESCRIBED IN CORRECTED QUITCLAIM DEED RECORDED AS INSTRUMENT NO. 21514114 IN THE OFFICIAL RECORDS OF BANNOCK COUNTY DESCRIBED AS FOLLOWS:

COMMENCING AT THE WEST 1/4 CORNER OF SECTION 1, BEING MARKED BY A 1" IRON ROD WITH NO CAP AS DESCRIBED IN CORNER PERPETUATION AND FILING RECORDED AS INSTRUMENT NO. 20520359 IN THE OFFICIAL RECORDS OF BANNOCK COUNTY, FROM WHICH THE CENTER 1/4 CORNER OF SECTION 1 BEARS SOUTH 89°54'39" EAST A DISTANCE OF 2629.33 FEET;

THENCE NORTH 0°38'28" WEST, ALONG THE WEST LINE OF SECTION 1, A DISTANCE OF 1624.95 FEET TO THE **POINT OF BEGINNING**;

THENCE NORTH 0°38'28" WEST, CONTINUING ALONG THE WEST LINE OF SECTION 1, A DISTANCE OF 153.15 FEET;

THENCE NORTH 78°59'42" WEST A DISTANCE OF 75.51 FEET TO A POINT OF TANGENCY WITH A 500.00 FOOT RADIUS CURVE WHOSE CENTER BEARS NORTH 11°00'18" EAST;

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN A NORTHWESTERLY DIRECTION THROUGH A CENTRAL ANGLE OF 48°40'36" FOR AN ARC LENGTH OF 424.78 FEET (THE CHORD OF SAID CURVE BEARS NORTH 54°39'24" WEST A DISTANCE OF 412.12 FEET) TO A POINT OF TANGENCY;

THENCE NORTH 30°19'06" WEST A DISTANCE OF 201.23 FEET TO A POINT OF TANGENCY WITH A 1000 FOOT RADIUS CURVE WHOSE CENTER BEARS NORTH 59°40'54" EAST;

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN A NORTHERLY DIRECTION THROUGH A CENTRAL ANGLE OF 35°53'28" FOR AN ARC LENGTH OF 626.42 FEET (THE CHORD OF SAID CURVE BEARS NORTH 12°22'22" EAST A DISTANCE OF 616.23 FEET) TO A POINT OF TANGENCY WITH THE EASTERLY RIGHT-OF-WAY LINE OF INTERSTATE 15 AS DEFINED IN FEDERAL AID PROJECT I-15-2(1)72, SAID POINT BEING A POINT OF CUSP;

*Focused on Solutions*

*Civil ♦ Environmental ♦ Transportation ♦ Planning ♦ Land Development ♦ Municipal ♦ Surveying*

**EXHIBIT "D"**
**Page 6 of 8**

21715051

THENCE SOUTH 5°34'22" WEST, ALONG THE EASTERLY RIGHT-OF-WAY LINE OF I-15, A DISTANCE OF 1560.60 FEET TO A POINT OF CUSP WITH A 350.00 FOOT RADIUS CURVE WHOSE CENTER BEARS SOUTH 84°25'38" EAST;

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN A NORTHEASTERLY DIRECTION THROUGH A CENTRAL ANGLE OF 72°20'22" FOR AN ARC LENGTH OF 441.90 FEET (THE CHORD OF SAID CURVE BEARS NORTH 41°44'33" EAST A DISTANCE OF 413.13 FEET) TO A POINT OF TANGENCY;

THENCE NORTH 77°54'44" EAST A DISTANCE OF 341.27 FEET TO A POINT OF TANGENCY WITH A 350.00 FOOT RADIUS CURVE WHOSE CENTER BEARS SOUTH 12°05'16 EAST;

THENCE FOLLOWING ALONG SAID CURVE TO THE RIGHT IN AN EASTERLY DIRECTION THROUGH A CENTRAL ANGLE OF 23°05'34" FOR AN ARC LENGTH OF 141.06 FEET (THE CHORD OF SAID CURVE BEARS NORTH 89°27'31" EAST A DISTANCE OF 140.11 FEET) TO A POINT OF TANGENCY;

THENCE SOUTH 78°59'42" EAST A DISTANCE OF 49.22 FEET TO THE **POINT OF BEGINNING.**

CONTAINING 8.07 ACRES, MORE OR LESS.

**RESERVING THEREFROM:**

AN EASEMENT FOR MAINTENANCE OF AN EXISTING IRRIGATION LINE ON THE NORTHERLY 200 FEET OF THE ABOVE DESCRIBED LANDS.

*Focused on Solutions*

*Civil ♦ Environmental ♦ Transportation ♦ Planning ♦ Land Development ♦ Municipal ♦ Surveying*

**EXHIBIT "D"**
**Page 7 of 8**



21715051

"Exhibit E"

Roadway Description thru
Rupp Property

A 150.00 foot wide strip of land located in the Northwest 1/4 of Section 1, Township 6 South, Range 34 East, Boise Meridian, being a portion of the land described in deed instrument 21514114, of the records of Bannock County, Idaho, more particularly described as follows:

Beginning at the Center 1/4 corner of Section 1, being marked by a 2 1/2" aluminum cap stamped PLS-10786, and recorded under Corner Perpetuation and Filing Record instrument 21617873 of the records of Bannock County, from which the South 1/4 corner of said Section 1 bears South 00°14'04" East, 2650.48 feet, **THE TRUE POINT OF BEGINNING;**

Thence North 89°54'40" West along the latitudinal centerline of said Section 1 a distance of 657.85 feet, to a point of non-tangency of a 1015.00 foot radius curve, from said point the center bears North 00°06'49" East;

Thence Northwesterly along said curve, thru a central angle of 62°04'26", and an arc distance of 1099.65 feet, to a point of tangency;

Thence North 27°48'45" West, a distance of 657.80 feet, to a point of tangency of a 925.00 foot radius curve, from said point the center bears South 62°11'15" West;

Thence Northwesterly along said curve, thru a central angle of 51°10'57", and an arc distance of 826.30 feet to a point of tangency;

Thence North 78°59'42" West, a distance of 148.17 feet, to a point on the West line of section 1;

Thence North 00°38'28" West, along the West line of Section 1, a distance of 153.15 feet;

Thence South 78°59'42" East, a distance of 179.09 feet, to a point of tangency of a 1075.00 foot radius curve, from said point the center bears, South 11°00'18" West;

Thence Southeasterly along said curve thru a central angle of 51°10'57", and an arc distance of 960.30 feet, to a point of tangency;

Thence South 27°48'45" East, a distance of 657.80 feet, to a point of tangency of a 865.00 foot radius curve, from said point the center bears North 62°11'15" East;

Thence Southeasterly along said curve thru a central angle of 62°05'55", and an arc distance of 937.51 feet, to a point of tangency;

Thence South 89°54'40" East parallel with and 150.00 feet north of the latitudinal centerline of Section 1, a distance of 656.57 feet, to a point on the Meridional centerline of Section 1;

Thence South 0°14'04" East along the Meridional centerline of Section 1 a distance of 150.00 feet to **THE TRUE POINT OF BEGINNING.**

**COMPRISING 11.68 acres more or less**



**EXHIBIT "D"**
**Page 8 of 8**

ITD – Plan  03-2007



T.6S., R.34E., B.M.

NOTES

① See Drainage Plans.

② See Illumination Plans.

FOC = Face of Curb

610-030A Fence Type 3B
382 L.F., 67+50-71+40, Lt.
414 L.F., 67+50-71+40, Rt.

610-250A Braces
2 Ea., 67+50.00-71+40, Lt.
2 Ea., 67+50.00-71+40, Rt.

614-015A Sidewalk
532 S.Y., 69+17-71+40, Rt. & Lt.

615-256A Curb Type 1
389 L.F., 67+50-71+40, Lt.
391 L.F., 67+50-71+40, Rt.

615-492A Curb & Gutter Type 2
386 L.F., 67+50-71+40, Lt.
394 L.F., 67+50-71+40, Rt.

618-010A Right-Of-Way Marker
1 Ea., 67+50.00, 80.00' Lt.
1 Ea., 69+17.00, 100.00' Lt.
1 Ea., 67+50.00, 80.00' Rt.
1 Ea., 69+17.00, 145.00' Rt.

618-025A Street Monument
1 Ea., 68+65.47

S912-05C Colored Concrete Pavement
532 S.Y., 69+17-71+40, Rt. & Lt.

KEY MAP

| DESIGNED | Z. Pratt |
| DESIGN CHECKED | P. Szobonya |
| DETAILED | L.McKinnon |
| DRAWING CHECKED | J. Baker |

SCALES SHOWN ARE FOR 11" X 17" PRINTS ONLY

CADD FILE NAME
20314_plan_001a.dgn

DRAWING DATE:
3/2/2018

IDAHO
TRANSPORTATION
DEPARTMENT

Stanley Consultants INC.

PROJECT NO.
A020(314)

ROADWAY PLAN 1

I-15, NORTHGATE INTERCHANGE
NORTHGATE PARKWAY
Sta. 67+50 to Sta. 71+40

English

COUNTY
Bannock

KEY NUMBER
20314

SHEET 38 OF 283

PROFESSIONAL ENGINEER
REGISTERED
10192
STATE OF IDAHO
CORTNEY H. GIBBS

REVISIONS

| NO. | DATE | BY | DESCRIPTION |



HILLCREST HEIGHTS

NORTHGATE PARKWAY APPROACH 97+29.39

CONSTRUCTION ITEMS

(405-435A) INSTALL PLANT MIX PAVEMENT SECTION PER NORTHGATE PARKWAY TYPICAL SECTION 6A INCLUDE GRANULAR SUBBASE AND $\frac{3}{4}$" AGGR TY A

(605-025A) INSTALL 12" STORM PIPE

(605-465A) INSTALL MANHOLE TYPE C

(605-515A) INSTALL CATCH BASIN TYPE 2

(614-024A) INSTALL CURB RAMP COMBINATION

(615-492A) INSTALL CURB AND GUTTER TYPE 2 (400 LF)

CONSTRUCTION NOTES

1. RETAIN AND PROTECT ALL EXISTING UNDERGROUND AND OVERHEAD UTILITIES. CALL **811** TO LOCATE EXISTING UTILITIES PRIOR TO THE START OF ANY WORK & COORDINATE AS NECESSARY DURING CONSTRUCTION.
2. CORE DRILL INTO EXISTING MANHOLE. VERIFY LOCATION, MATERIAL AND DEPTH AND NOTIFY ENGINEER PRIOR TO CONSTRUCTION.
3. EXISTING POWER POLE AND GUY SHALL BE RE-LOCATED BY IDAHO POWER. CONTRACTOR SHALL FACILITATE AND COORDINATE AS NEEDED.
4. PATH CONSTRUCTION BY OTHERS
5. GRADE SWALE TO INLET
6. ADJUST UTILITY TO GRADE
7. RE-LOCATE JUNCTION BOX TO WEST SIDE OF APPROACH

SHEET NUMBER C - 1.0

INTELLECTUAL PROPERTY NOTICE

THE DESIGN, IDEAS, DRAWINGS CONTAINED ON THIS SHEET AND WITHIN THIS SET OF ASSOCIATED DOCUMENTS ARE THE SOLE PROPERTY OF RMES AND SURVEYING, AND ARE SUBJECT TO THE COPYRIGHT OF RMES. THEY ARE CREATED, EVOLVED AND DEVELOPED FOR USE ON THIS SPECIFIC PROJECT. ANY USE OF THESE DRAWINGS, DESIGNS, MATERIALS OR INFORMATION CONTAINED HEREIN, INCLUDING BUT NOT LIMITED TO COPYING OR REPRODUCTION, WHICH IS NOT EXPRESSLY AUTHORIZED BY RMES IS STRICTLY PROHIBITED AS AN INFRINGEMENT OF ITS COPYRIGHT AND MAY RESULT IN LIABILITY.

SHEET INFORMATION

DESIGNER: C NEWBERRY | REVIEWER: M GREER

CREATED: M GREER | LAST REVISED: ---

REVISIONS

| # | DATE | BY | DESCRIPTION |
|---|---|---|---|
| 1 | XXXXX | XXXXX | XXXXXXXXXXXXXXXXXXXXXXXX |
| 2 | | | |
| 3 | | | |
| 4 | | | |

HILLCREST HEIGHTS

PROFESSIONAL ENGINEER REGISTERED 8613 9/24/19 STATE OF IDAHO J. MITCHELL GREER

RMES Engineers ♦ Surveyors ♦ Planners
301 58th St. W. #138 ♦ Williston, ND 58801 ♦ (701) 572-0110
600 E. Oak St. ♦ Pocatello, ID 83201 ♦ (208) 234-0110

HILLCREST HEIGTS APPROACH
STA. 97+29.39
NORTHGATE PARKWAY
ROADWAY APPROACH IMPROVEMENTS

ARCH B SCALE (12"x18")
1 INCH =40 FEET
0 40 80
0 20 40
1 INCH = 20 FEET
ARCH D SCALE (24"x36")

SHEET NUMBER C - 1.0

EXHIBIT "E"
Page 2 of 3



ITD - Plan 03-2007

610-030A Fence Type B3
374 ft., 94+60-98+00, Lt.
307 ft., 94+60-98+00, Rt.

610-250A Braces
2 Ea., 94+60-98+00, Lt.
2 Ea., 94+60-98+00, Rt.

615-256A Curb Type 1
345 ft., 94+60-98+00, Lt.
335 ft., 94+60-98+00, Rt.

615-492A Curb & Gutter Type 2
355 ft., 94+60-98+00, Lt.
326 ft., 94+60-98+00, Rt.

618-010A Right-Of-Way Marker
3 Ea., See Contractor Notes

NOTES

1. See Illumination Plans.

FOC = Face of Curb

KEY MAP

| REVISIONS | | | | DESIGNED Z. Pratt | SCALES SHOWN ARE FOR 11" X 17" PRINTS ONLY | IDAHO TRANSPORTATION DEPARTMENT | PROJECT NO. | ROADWAY PLAN 7 | English |
|---|---|---|---|---|---|---|---|---|---|
| NO. | DATE | BY | DESCRIPTION | DESIGN CHECKED P. Szobonya | CADD FILE NAME 20314_plan_007a.dgn | Stanley Consultants INC. | A020(314) | I-15, NORTHGATE INTERCHANGE NORTHGATE PARKWAY Sta. 94+60 to Sta. 99+00 | COUNTY Bannock |
| | | | | DETAILED L.McKinnon | DRAWING DATE: 3/28/2018 | | | | KEY NUMBER 20314 |
| | | | | DRAWING CHECKED J. Baker | | | | | SHEET 51 OF 291 |

PROFESSIONAL ENGINEER REGISTERED 10192 29 Mar 2018 STATE OF IDAHO CORTNEY H. GIBBS

3/28/2018 ...\655105_9\20314_plan_007a.dgn

**EXHIBIT "E"**
**Page 3 of 3**

*Intersection  Already  designed & Engineered*



MARK A. ECHO HAWK
ERIC L. OLSEN
JOSEPH T. PRESTON
PATRICK J. DAVIS
ATTORNEYS

505 PERSHING AVE., STE. 100
PO BOX 6119
POCATELLO, ID 83205-6119
208.478.1624
208.478-1670 FAX
WWW.ECHOHAWK.COM

May 30, 2018

Lane V. Erickson, Esq.                                    *Sent Via Email: lve@racinelaw.net*
*Racine Olson*
201 E. Center Street
Pocatello, ID 83202

### Re:     Rupp Family Trust - April 6, 2017 Right of Way Purchase and Sale Agreement

Mr. Erickson:

We are in receipt of your letter of May 22, 2018. I will respond point by point in the order in which you raise each issue in your letter, respectively.

### 1.  Addendum No. 1

As to Addendum No. 1, your letter states that this Addendum alters the original agreement. That is true, but Addendum No. 1 explicitly stated that "All other terms of the CONTRACT … not modified by this ADDENDUM remain the same." The two items from the Agreement altered by Addendum No. 1 were Section 9.a.i, regarding the first two closing dates (an action taken in part to accommodate Seller's assertion of tax purposes), and Section 6, regarding payment of purchase price and specifically what lands would be purchased on the two new closing dates. The Agreement was not altered in any other way. Both of those closings have come and gone. The money has changed hands. Addendum No. 1 has been performed (See Exhibit 1).

### 2.  Addendum No. 2

Addendum No. 2, for all intents and purposes, no longer exists. Addendum No. 2 was an offer from Buyer that expired by its own terms at 5:00 p.m. on March 17, 2018 (See Exhibit 2).

### 3.  Legal Description of the East Parcel

In the first instance, Section 3 of the Agreement was not modified in any way by Addendum No. 1, and that entire Section remains fully in force. Secondly, the parcel in question was surveyed with exact metes and bounds described on September 13, 2017 (See Exhibit 3). That legal description, with the official stamp of Gerald V. Evans is attached hereto for your review, as well as a survey map.  This survey and its associated materials were delivered to Seller, and acknowledged and approved by Seller, prior to the first closing transaction, on the date of 9/22/2017.  These materials were supplied to your client again as a reminder on March 15, 2018 via email.  A copy of that email is also provided for your review (See Exhibit 4).

**EXHIBIT "F"**
**Page 1 of 3**

*Lane Erickson, Esq.*
*May 30, 2018*
*Page 2*

Finally, that portion of the "East Parcel," described in your letter is very clearly included within that legal description.

4.  **Connection Points**

As Addendum No. 2 has expired, there is no need to address this particular issue. However, in order to facilitate a timely resolution of the present conflict, in exchange for removing all discussion of sewer and water from the current and enforceable Agreement, Buyer is willing to amend the Agreement to commit to provide a total of three access points along Seller's future Northgate Parkway frontage. The first of these will be placed approximately 1400' east of the Interchange, as already designed and approved in the Olympus/Northgate road engineering documents. The remaining two access points will be provided as a *material condition subsequent*, and the placement of these two access points will be determined in good faith by Buyer (who has the relevant expertise in city planning to place them consistent with good traffic design). This modification would replace the expired Addendum No. 2, as an addendum to the Agreement. Otherwise, Buyer expects Seller to perform immediately.

5.  **Conclusion**

At this point, Buyer's position is that Seller is engaging in bad faith delay. Everything that has been set forth in your letter of May 22, 2018 has been known to Seller for some time. There is simply no reason not to close on the remaining portion of the Agreement. This same letter raised issues not previously raised as justifications for not closing on this transaction, and they were not valid reasons as Addendum No. 1 has been performed, Addendum No. 2 has expired, and the land has been surveyed and legally described.

As to the initial issue of Section 10(e) not being completed, in the first instance, Buyer is satisfied with the current status of that portion of the Agreement, which is sufficient to trigger Seller's duty to perform. However, Buyer has obtained from both the City of Pocatello and City of Chubbuck "will serve" letters, indicating that each has the capacity and willingness to provide sewer and water to Seller's property (See Exhibit 5). Each is attached for your review. This letter constitutes a final demand to provide a final closing date, to occur on or before June 5, 2018. Should Seller fail to do so, Buyer will be left with no option other than to file suit, seek specific performance, and all legal fees incurred to date.

Sincerely,

/s/

Patrick J. Davis

PJD/jj
Enclosures
cc:  client

H:\WDOX\CLIENTS\1657\0004\00077215.DOCX

**EXHIBIT "F"**
**Page 2 of 3**

*Letter to Rupp Trusts*
*May 4, 2018*
*Page 2*

Additionally, Section 34 of the Agreement provides that time is of the essence. Should Seller's non-performance cause Buyer to fail to perform in its obligation to other parties, Buyer will seek indemnification from Seller.

Additionally, the Agreement provides, in Section 19 that the unsuccessful party in a dispute would be responsible for the successful party's attorney's fees, which Seller has now wrongfully caused Buyer to incur. Should you have any questions or concerns, please contact our office at your convenience.

Sincerely,

Patrick J. Davis

cc: client

H:\WDOX\CLIENTS\1337\0001\00058368.DOCX

**EXHIBIT "F"**
**Page 3 of 3**



**STATE OF IDAHO**
*Office of the secretary of state, Lawerence Denney*
**STATEMENT OF DISSOLUTION (PARTNERSHIP)**
Idaho Secretary of State
PO Box 83720
Boise, ID 83720-0080
(208) 334-2301
Filing Fee: $0

**For Office Use Only** 0003665919

**-FILED-**

File #: 0003665919

Date Filed: 11/22/2019 10:40:00 AM

| Statement of Dissolution | |
|---|---|
| Select one: Standard, Expedited or Same Day Service (see descriptions below) | Standard (filing fee $0) |

1. The name of the partnership is
   Town Center JV

   The file number of this entity on the records of the Idaho Secretary of State is:  0003347976

2. The statement of partnership authority was originally filed on:
   Filing Date:   11/13/2018

3. Dissolution

   ☒ By checking this box, I confirm the partnership is dissolved and is winding up its business.

4. Effective Date
   The dissolution shall be effective                     when filed with the Secretary of State.

Pursuant to Idaho Code § 30-23-802, the undersigned applies to the Secretary of State for statement of dissolution. This dissolution must be manually signed by at least two partners.

Sign Here _____   Date  11/14/2019

Sign Here _____   Date  11/14/2019

Print & Mail Enclosures

☒ I understand the document can ONLY be filed if the following items are included:

This filing form (submit within 30 days) with the required signature(s).

There is no fee to file this amendment unless you request expedited filing ($40 - check payable to Secretary of State; signed and recently dated); if 24 hour processing, $100.

If you are submitting a correction to this amendment, return the correction letter with your updated document.

B0357-8177 11/22/2019 10:40 AM Received by ID Secretary of State Lawerence Denney

**EXHIBIT "G"**
**Page 1 of 1**



PLANNING & DEVELOPMENT SERVICES
PO Box 4169, 911 North Seventh Avenue
Pocatello, Idaho 83205
(208)234-6184     FAX (208)234-6586

**REQUEST FOR ANNEXATION AND ZONING APPLICATION**

Submittal Received: _11·18·19_     *Application #:* _19 - 3493_     Application #: _19 - 3493_
Submittal Approved by: _ML_     *P&Z Date: 12·11·19  Ref # 38 and*     Receipt Date: _11·20·19_
Plan Review Approved by: _____     *CC Date: 1·2·20  Ref # 42*     Date Approved: _____

*Dates for a public hearing or Council consideration will not be scheduled until plan design review approval has been received.*

Filing Fee $1,066 +(_7_ addresses X $3 = $ _21.00_ ) + Survey Accuracy Review $200 =Total Due $ _1287.00_

**Owner/Applicant:**     **Representative (if applicable):**
Name: _TOWN CENTER JV_     Name: _KEN PAPE_
Address: _4990 VALENTY RD., STE H_     Address: _____
City, State, Zip: _CHUBBUCK, ID 83202_     City, State, Zip: _____
Phone: _____     Phone: _(208) 243-1977_
Email: _____     Email: _kenpape.pd@gmail.com_

Do you own the subject property or have the owner's consent to annexation? Yes ☒ No ☐

Site Location: _NW 1/4 SECTION 1, TOWNSHIP 6 SOUTH, RANGE 34 EAST, B.M._
_BANNOCK COUNTY_

Legal Description: _See ATTACHED_
_____
_____
_____
_____

Is the property within, or part of, an approved subdivision? _NO_ (The property may need to be platted prior to issuance of a building permit.  See subdivision review process.)

Requested Zoning: _COMMERCIAL_

**In addition to the above, the following information must accompany this application:**

1.  Attach Consent to Annexation completed and recorded with Bannock County Recorder.

2.  Two sets of typed, gummed mailing labels with all of the names and addresses of the property owners within a 300 foot radius of the subject property.  In addition, a fee of $1.50 per address per required notice is required (two notices per address will be required).  Failure to provide a complete list of names may nullify this application.

3.  Survey map with topography noted of the area to be annexed.  This is to be done by a private certified surveyor and submitted to the City for review (applicant must bear all costs).

**EXHIBIT "H"**
**Page 1 of 2**

4. Applicant(s) must provide a written justification for the requested zoning, addressing the variables described in Municipal Code Section 17.02.180(E).

5. A site map (11" X 17" drawn to scale) of the area to be annexed.

6. A title report, property deed, or other legal documentation of ownership of the site in question whether freehold, option or lease, must be submitted.

7. A complete legal description of the parcel to be annexed, signed off and verified by the city Surveyor prior to the filing of this petition.  This description must match the site map required in item #4.  Legal descriptions should be prepared by a licensed surveyor to avoid possible delays in the petition process.

8. A signed Affidavit of Mailing List.

9. A statement or conceptual drawing (to scale) showing the proposed use and/or number of lots for development on the property.  If no development plan exists, the City will calculate maximum number of lots or coverage based upon the proposed zoning.

10. A documented source of water, deliverable to the City, sufficient for the water needs of Developer and the development (described above), or cash as necessary to obtain the water utilizing a formula determined by the City and based upon the following:

*Current market value of water per acre foot*
*Multiplied by*
*Average water use as represented in acre feet*
*Equals*
*Subtotal water value*
*Add*
*20% Administrative/Legal costs*
*Equals*
*Amount payable to the City*

The documentation of water source must be verified and approved by the City Attorney prior to filing the petition.

The approval of this application for annexation does not permit the violation of any section of the Building Code, or other City ordinances.

I hereby acknowledge that I have read this application, and state that the above information is correct, and that this shall serve as my written request for annexation of the lands described herein pursuant to Idaho Code 50-222 and 67-6525.

Applicant's Signature: _____    Date: 11 / 15 / 19

Representative's Signature: _____    Date: _____

Applicant or representative must be present at the public hearing.  A sign giving public notice will be posted at the proposed annexation site during the course of these proceedings.

updated 2/28/18

**EXHIBIT "H"**
**Page 2 of 2**



*Creek Hollow & Associates, Inc.*

611 Wilson, Suite 1A, Pocatello, ID 83201
Phone: (208) 709-3113 / Fax: (208) 238-8852

November 20, 2019

Written Justification - Northgate Parkway Annexation

1.  The proposed Zoning of Commercial use would be in the community's best interest because the surrounding parcels adjoining the area of Annexation, West of the Round-a-bout at Olympus Drive, will likely be zoned commercial with the new connection of the Interstate Interchange. The area of Annexation, East of the Round-a-bout at Olympus Drive, is currently zoned Commercial at the adjoining parcel to the South.

2.  The list of uses permitted by the zoning ordinance would blend as stated above and best use of zoning ordinance for landscaping along the Street Right-of-Way West of the Round-a-bout.

3.  The subject site is physically suitable.  The West portion of the annexation is already constructed street and walking/greenway paths.  The East portion is physically suitable for future development as a street or building construction.

4.  The uses permitted in the proposed zoning district would be adequately served by public facilities  and services.  Since the West portion is current a constructed street, this will actually be the route most public services will be using to benefit the community and connecting to the Interstate Highway.

5.  The uses permitted in the proposed zoning district will be compatible in terms of their scale, mass, coverage, density and intensity with the adjacent land uses.

6.  The proposed zoning designation is consistent with Comprehensive Plan Land Use Map as the surrounding areas are zoned the same as the proposed Zone change.

**EXHIBIT "I"**
**Page 1 of 1**

*12*

**MEMORANDUM**

TO:          Mayor Blad and City Council

FROM:      Jared Johnson, City Attorney

DATE:       October 31, 2019

RE:          Right-Of-Way Acceptance – Northgate Parkway


I have reviewed the accompanying executive summary and Highway Right-Of-Way Plat regarding the City of Pocatello's acceptance of the indicated portion of Northgate Parkway. The information provided complies with right-of-way acceptance as described in Idaho Code Title 40 Chapter 2. This portion of Northgate Parkway is currently in Bannock County and it is my understanding that the Bannock County Commissioners will be preparing a letter in support of this acceptance.  It is also my understanding that the developers will be submitting an annexation application that includes this parcel in the very near future.

I agree with the conditions as stated in the executive summary.  I advise Council to 1) accept the right-of-way, subject to the conditions in the executive summary, and 2) authorize the Mayor to sign all necessary documents related to this acceptance.

**EXHIBIT "J"**
**Page 1 of 1**

21919292

## RIGHT-OF-WAY DEED

THIS INDENTURE, made this 6th day of December, 2019, between Town Center JV, a dissolved General Partnership comprised of Millennial Development Partners, LLC and Portneuf Development, LLC, hereinafter referred to as "GRANTORS", and the CITY OF POCATELLO, a municipal corporation, 911 North 7th Avenue, Pocatello, ID 83201, County of Bannock, hereinafter referred to as "GRANTEE".

That GRANTORS, for an in consideration of the sum of ONE AND NO.100 DOLLARS ($1.00), lawful money of the United States of America, and other good and valuable considerations to GRANTORS, in hand paid by GRANTEE, the receipt whereof is hereby acknowledged by GRANTOR, does by these presents remise, release and forever quitclaim unto GRANTEE for public street, highway and associated purposes, all the following described real estate, situated in the County of Bannock, State of Idaho, to-wit:

Parcel: ROW 2 as described on the NORTHGATE PARKWAY Right-of-Way Plat filed in the Office of the Recorder for Bannock County, Idaho as Instrument No. _21919291_____.

Together with all and singular the tenements, hereditaments and appurtenances thereto belonging or in any way appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof.

TO HAVE AND TO HOLD, all and singular, the said premises, together with the appurtenances and privileges thereto incident, unto the said party of the second part and to its heirs and assigns forever.

IN WITNESS WHEREOF, GRANTOS have hereunto subscribed their hands and seals on this day and year first written.

Town Center JV
Portneuf Development LLC

_____
Kenneth D. Pape, Chief Executive Manager

Town Center JV
Millennial Development Partners, LLC

_____
Arvil E. "Buck" Swaney, Managing Member

**EXHIBIT "K"**
**Page 1 of 2**

21919292

State of Idaho, County of Bannock

On this 6th day of December in the year of 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Kenneth D. Pape, known or identified to me to be the Chief Executive Manager of PORTNEUF DEVELOPMENT, LLC one of the general partners in the partnership of TOWN CENTER JV, a dissolved Idaho general partnership and one of the partners that subscribed said partnership name to the foregoing instrument and acknowledged to me that they executed the within instrument on behalf of said limited liability company and that such limited liability company executed the same in said partnership.

Residing at: Pocatella, ID
Commission Expires: 5.25.2024

ROSEMARIE HUNTER
COMMISSION #22273
NOTARY PUBLIC
STATE OF IDAHO

State of Idaho, County of Bannock

On this 6th day of December in the year of 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Arvile E. "Buck" Swaney, known or identified to me to be the Managing Member of MILLENNIAL DEVELOPMENT PARTNERS, LLC one of the general partners in the partnership of TOWN CENTER JV, a dissolved Idaho general partnership and one of the partners that subscribed said partnership name to the foregoing instrument and acknowledged to me that they executed the within instrument on behalf of said limited liability company and that such limited liability company executed the same in said partnership.

Residing at: Pocatella, ID
Commission Expires: 5.25.2024

ROSEMARIE HUNTER
COMMISSION #22273
NOTARY PUBLIC
STATE OF IDAHO

Creek Hollow & Assoc

21919292          2019 DEC -6 A 10: 32

**EXHIBIT "K"**
**Page 2 of 2**



**EXHIBIT "L"**

**Page 1 of 2**



## LINE TABLE

| LINE | BEARING | DISTANCE |
|---|---|---|
| L1 | N 00°15'27" E | 150.00' |
| L2 | N 36°48'47" E | 150.00' |
| L3 | S 89°54'37" E | 3.34' |
| L4 | N 89°54'37" W | 258.50' |
| L5 | N 00°14'05" W | 150.00' |
| L6 | S 00°01'08" W | 326.41' |

## CURVE TABLE

| CURVE | ARC LENGTH | RADIUS | DELTA ANGLE | CHORD BEARING | CHORD LENGTH |
|---|---|---|---|---|---|
| C1 | 1099.64' | 1015.00' | 62°04'26" | N 58°50'55" W | 1046.65' |
| C2 | 409.59' | 925.00' | 25°22'14" | N 40°29'49" W | 406.25' |
| C3 | 476.02' | 1075.00' | 25°22'16" | S 40°29'50" E | 472.14' |
| C4 | 937.51' | 865.00' | 62°05'55" | S 58°51'40" E | 892.29' |
| C5 | 70.61' | 100.00' | 40°27'33" | N 69°51'37" E | 69.16' |
| C6 | 183.60' | 130.00' | 80°55'06" | S 89°54'37" E | 168.72' |
| C7 | 70.61' | 100.00' | 40°27'33" | S 69°40'51" E | 69.16' |
| C8 | 489.91' | 1000.00' | 28°04'11" | N 76°03'52" E | 485.03' |

### BASIS OF BEARING
PER CITY OF POCATELLO DATUM BASED ON THE CENTRAL MERIDIAN OF THE EAST ZONE OF THE IDAHO STATE PLANE COORDINATE SYSTEM

0     600     1200

### LEGEND

——————— ANNEXATION BOUNDARY

– – – – – SECTION LINES

———— · ———— INTERIOR PARCEL LINES/ FUTURE RIGHT-OF-WAY

△ ANNEXATION BOUNDARY ANGLE POINT

### TOWN CENTER JV
ANNEXATION MAP

PORTION OF SEC. 1, T. 6 S., R. 34 E, AND PORTION OF GOVERMENT LOT 5, SEC. 6, T. 6S., R. 35E, BANNOCK COUNTY, ID

| JOB NO. 17053/V04 | | REVISIONS | | SCALE 1" = 600' |
|---|---|---|---|---|
| DRAWN BY: CNA | 1 | | | |
| 11/16/19 | 2 | | | SHEET 1 OF 1 |

# EXHIBIT "L"
## Page 2 of 2

22004098

OFFICIAL RECORD BK#
BANNOCK COUNTY IDAHO

RECORDED AT REQUEST
FEE ___ DEPUTY ___

CITY OF POCATELLO

22004098

2020 MAR 11 P 1:32

ORDINANCE NO. 3046

AN ORDINANCE OF THE CITY OF POCATELLO, A MUNICIPAL CORPORATION OF IDAHO, ANNEXING AND ZONING THREE PARCELS OF LAND TOTALING 22.256 ACRES LOCATED IN THE NORTHWEST ¼ OF SECTION 1, TOWNSHIP 6 SOUTH, RANGE 34 EAST, BOISE MERIDIAN, BANNOCK COUNTY, IDAHO, BY EXTENDING THE CITY CORPORATE BOUNDARIES FROM THE EASTERN EXTENT OF THE NORTHGATGE INTERCHANGE TO THE NORTHEASTERN EXTENT OF THE POCATELLO CITY LIMITS, MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" OF THIS ORDINANCE.

PROVIDING FOR THE CITY CLERK TO FILE A CERTIFIED COPY OF THIS ORDINANCE WITH THE IDAHO STATE TAX COMMISSION AND WITH THE BANNOCK COUNTY AUDITOR, TREASURER, AND ASSESSOR IN ACCORDANCE WITH IDAHO CODE §§50-223 AND 63-2215; PROVIDING FOR SAID LAND TO BE ZONED COMMERCIAL GENERAL (CG), AND THE COMPREHENSIVE PLAN MAP DESIGNATION TO BE AMENDED FROM "MIXED-USE (MU)" TO "COMMERCIAL (C)"; AND PROVIDING FOR THIS ORDINANCE TO BE IN FULL FORCE AND EFFECT FROM AND AFTER ITS PASSAGE, APPROVAL, AND PUBLICATION ACCORDING TO LAW.

WHEREAS, there are certain lands lying contiguous or adjacent to the City of Pocatello, subject to annexation in accordance with the provisions of Idaho Code §50-222; and

WHEREAS, Application was made to the City by the owner of the lands for annexation of these lands; a Public Hearing was held on December 11, 2019, before the Planning and Zoning Commission; and

**EXHIBIT "M"**
**Page 1 of 6**



2 2 0 0 4 0 9 8

WHEREAS, a second Public Hearing was held before the City Council on January 2, 2020, to hear testimony regarding the proposed annexation, zoning designation, and Comprehensive Plan designation; and

WHEREAS, the City Council has determined that it is in the best interest of the City of Pocatello and the residents thereof that the said lands heretofore described in this title and hereinafter described in this ordinance be annexed by the City of Pocatello and be simultaneously zoned;

NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF POCATELLO AS FOLLOWS:

Section 1:  That the subject lands more particularly described in Exhibit "A" of this ordinance be hereby annexed and made a part of the City of Pocatello.

Section 2:  That the official zoning map adopted by the City of Pocatello be hereby amended to incorporate the land annexed herein and to depict the "Commercial General (CG)" zone be established upon said land.

Section 3:  That the City's Comprehensive Plan Map designation of the land described in Exhibit "A" of this ordinance be amended from "Mixed-Use (MU)" to "Commercial (C)".

Section 4:  That immediately after the passage, approval, and publication of this ordinance according to law, the City Clerk is hereby directed to file with the Bannock County Auditor, Treasurer, and Assessor, and with the Idaho State Tax Commission, a certified copy of this ordinance.

Section 5:  That upon the passage, approval, and publication of this ordinance according to law, the incorporated limits of the City of Pocatello shall extend to and include the lands described in Exhibit "A" of this ordinance and thereafter all property and persons within

**EXHIBIT "M"**
**Page 2 of 6**

22004098



the limits of the lands herein annexed shall be subject to all of the provisions of the laws of the City of Pocatello and to the police regulations thereof.

Section 6: That this Ordinance shall be in full force and effect from and after its passage, approval, the execution of an Annexation Agreement, and publication according to law.

PASSED AND APPROVED this 5th of March, 2020.

CITY OF POCATELLO, a municipal corporation of Idaho

BRIAN C. BLAD, Mayor

ATTEST:

RUTH NEWSOM, City Clerk

STATE OF IDAHO        )
                      ) ss:
County of Bannock     )

On this 5th day of March, 2020, before me, the undersigned, a Notary Public for the State, personally appeared Brian C. Blad and Ruth Newsom, known to me to be the Mayor and City Clerk, respectively, of the City of Pocatello, and acknowledged to me that they executed the foregoing instrument for and on behalf of said municipal corporation and that said municipal corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the date and year in this certificate first above written.

(SEAL)

NOTARY PUBLIC FOR IDAHO
Residing in _____, Idaho
Exp. 3-22-24

ORDINANCE                        - 3 -                        **EXHIBIT "M"**
                                                              **Page 3 of 6**



22004098

## EXHIBIT A

**Parcel 1**

A parcel of land located in the Northwest Quarter of Section 1, Township 6 South, Range 34 East, Boise Meridian, Bannock County, Idaho, with a Basis of Bearings per City of Pocatello Datum based on the Central Meridian of the East Zone of the Idaho State Plane Coordinate System, more particularly described as follows:

Commencing at the West Quarter Corner of said Section 1, Township 6 South, Range 34 East, being marked by 1 inch iron rod as shown on Corner Perpetuation and Filing, Instrument No. 20520359;  thence along the Latitudinal Centerline of said Section 1, South 89°54'37" East 1971.46 feet to the point of non-tangency with a 1015.00 foot radius curve concave to the northeast of which radius bears North 00°06'52" East, also being the **Point of Beginning**; thence northwesterly 1099.64 feet along the arc of said 1015.00 foot radius curve to the right through a central angle of 62°04'26" and a long chord that bears North 58°50'55" West 1046.65 feet;  thence North 27°48'42" West 657.76 feet to the point of tangency with a 925.00 foot radius curve concave to the southwest of which radius bears South 62°11'18" West; thence northwesterly 409.59 feet along the arc of said 925.00 foot radius curve to the left through a central angle of 25°22'14"  and a long chord that bears North 40°29'49" West 406.25 feet to the East line of State of Idaho Highway Right-of-Way deed, Instrument No. 21811260; thence along said East line, North 36°48'47" East 150.00 feet to a point of non-tangency with a 1075.00 foot radius curve concave to the southwest of which radius bears South 36°49'02" West;  thence southeasterly 476.02 feet along said 1075.00 foot radius curve to the right through a central angle of 25°22'16" and a long chord that bears South 40°29'50" East 472.14 feet;  thence South 27°48'42" East 657.76 feet to a point of tangency with a 865.00 foot radius curve concave to the northeast of which radius bears North 62°11'18" East;   thence southeasterly 937.51 feet along said 865.00 foot radius curve to the left through a central angle of 62°05'55" and a long chord that bears South 58°51'40" East 892.29 feet to the Northerly boundary line of City of Pocatello Ordinance No. 3001;  thence along said West line, South 00°15'27" West 150.00 feet to the **Point of Beginning**.

Parcel contains 7.297 acres, more or less.

**Parcel 2**

A parcel of land located in the Northwest Quarter of Section 1, Township 6 South, Range 34 East, Boise Meridian, Bannock County, Idaho, with a Basis of Bearings per City of Pocatello Datum based on the Central Meridian of the East Zone of the Idaho State Plane Coordinate System, more particularly described as follows:

Commencing at the West Quarter Corner of said Section 1, Township 6 South, Range 34 East, being marked by 1 inch iron rod as shown on Corner Perpetuation and Filing, Instrument No. 20520359;  thence along the Latitudinal Centerline of said Section 1, South 89°54'37" East 1971.46 feet to the Northerly boundary line of City of Pocatello Ordinance No. 3001;  thence along said Northerly boundary line, North 00°15'27" East 150.00 feet;  thence continuing along said Northerly boundary line, South 89°54'37" East 3.34 feet to the point of tangency with a

ORDINANCE                                    - 4 -                              **EXHIBIT "M"**

**Page 4 of 6**



22004098

100.00 foot radius curve concave to the northwest of which radius bears North 00°04'27" East, also being the **Point of Beginning**;  thence northeasterly 70.61 feet along the arc of said 100.00 foot radius curve to the left through a central angle of 40°27'33" and a long chord that bears North 69°51'37" East 69.16 feet to a point of reverse curvature with a 130.00 foot radius curve concave to the south of which radius bears South 40°22'10" East;  thence northeasterly 183.60 feet along the arc of said 130.00 foot radius curve to the right through a central angle of 80°55'05"  and a long chord that bears South 89°54'37" East 168.72 feet to a point of reverse curvature with a 100.00 foot radius curve concave to the northeast of which radius bears North 40°31'52" East;  thence southeasterly 70.61 feet along said 100.00 foot radius curve to the left through a central angle of 40°27'33" and a long chord that bears South 69°40'51" East 69.16 feet to the Northerly Boundary line of City of Pocatello Ordinance 3001;  thence along said Northerly Boundary line, North 89°54'37" West 298.50 feet to the to the **Point of Beginning**.

Parcel contains 0.198 acres, more or less.

### Parcel 3

A parcel of land located in the Northeast Quarter of Section 1, Township 6 South, Range 34 East,  and a portion of Government Lot 5 of Section 6, Township 6 South, Range 35 East, Boise Meridian, Bannock County, Idaho, with a Basis of Bearings per City of Pocatello Datum based on the Central Meridian of the East Zone of the Idaho State Plane Coordinate System, more particularly described as follows:

Commencing at the Center Quarter Corner of said Section 1, Township 6 South, Range 34 East, being marked by a 3 inch aluminum cap as shown on Corner Perpetuation and Filing, Instrument No. 21617873, said point being the **Point of Beginning**;  thence along Northerly Boundary line of City of Pocatello Ordinance 3001,  North 00°14'03" West 150.00 feet; thence parallel with the Latitudinal Centerline of said Section 1, South 89°54'37" East 2624.50 feet to the Easterly line of said Section 1, Township 6 South, Range 34 East;  thence continuing parallel with said Latitudinal Centerline of Section 1, South 89°54'37" East 643.19 feet to a point of tangency with a 1000.00 foot radius curve concave to the northwest of which radius bears North 00°05'57" East;  thence northeasterly 489.91 feet along the arc of said 1000.00 foot radius curve to the left through a central angle of 28°04'11" and a long chord that bears North 76°03'52" East 485.03 feet to the East line of Government Lot 5, Township 6 South, Range 35 East;  thence along said East line, South 00°01'08" West 326.41 feet to the Southeast corner of said Government Lot 5, also being the Northeast corner of the City of Pocatello Ordinance 3001;  thence along the Northerly Boundary line of City of Pocatello Ordinance 3001 the following three (3) courses;  (1) thence along the Latitudinal Centerline of said Section 6, Township 6 South, Range 35 East, North 89°47'38" West 1114.26 feet to the West Quarter Corner of Section 6, Township 6 South, Range 35 East monumented by a 2 inch aluminum cap per Corner Perpetuation and Filing, Instrument No. 21707718;  (2) thence along the Easterly line of Section 1, Township 6 South, Range 34 East, North 00°10'57" East 56.61 feet to the East Quarter Corner of said Section 1, monumented with a 2 inch aluminum cap per Corner Perpetuation and Filing, Instrument No. 94013315;  (3) thence along the Latitudinal Centerline of said Section 1, North 89°54'37" West 2623.46 feet to the **Point of Beginning**.

Parcel contains 14.761 acres, more or less.

**EXHIBIT "M"**
**Page 5 of 6**



**EXHIBIT "M"**

**Page 6 of 6**

OFFICIAL RECORD BK# 0      FEE 15.00 DEPUTY JM
BANNOCK COUNTY IDAHO       RECORDED AT REQUEST OF

Pioneer Title Pocatello

22008170      2020 May 19 AM 11:19
Electronically Recorded by Simplifile



## QUITCLAIM DEED

For Value Received

Town Center JV, a dissolved General Partnership comprised of
Millennial Development Partners, LLC and Portneuf Development, LLC

do hereby convey, release, remise and forever quit claim unto

Millennial Development Partners, LLC, as to 50% interest and
Portneuf Builders, LLC, as to 50% interest

whose address is PO Box 2557, Pocatello, ID 83206

the following described premises, to-wit:

See Exhibit A attached hereto and made a part hereof.

together with their appurtenances.

Dated: May 1, 2020

Town Center JV

BY: Portneuf Development, LLC
Kenneth D. Pape, Chief Executive Manager

Town Center JV

BY: Millennial Development Partners, LLC
Arvil E. "Buck" Swaney, Managing Member

State of _Idaho_ , County of _Bannock_
This record was acknowledged before me on _May 18, 2020_ by Kenneth D. Pape, as
Chief Executive Officer of Portneuf Development, LLC partner of Town Center JV.

Signature of notary public
Commission Expires: 5-25-2024

```
ROSEMARIE HUNTER
COMMISSION #22273
NOTARY PUBLIC
STATE OF IDAHO
```

**EXHIBIT "N"**
**Page 1 of 4**

Instrument: 22008170 Page:0

State of _Idaho_, County of _Bannat_

This record was acknowledged before me on _May 18, 2020_ by Arvil E. "Buck" Swaney, as Managing Member of Millennial Development Partners, LLC partner of Town Center JV.

_Rosill, H.P_
Signature of notary public
Commission Expires: _5.25.2024_

```
ROSEMARIE HUNTER
COMMISSION #22273
NOTARY PUBLIC
STATE OF IDAHO
```

**EXHIBIT "N"**
**Page 2 of 4**

Instrument: 22008170 Page:0



## Creek Hollow & Associates, Inc.

611 Wilson Ave., Suite 1A, Pocatello, ID 83201
Phone:  (208) 709-3113 / Fax: (208) 238-8852

**LEGAL DESCRIPTION**
10 foot wide Parcel - South of Northgate Parkway

A parcel of land located in the Northwest Quarter of Section 1, Township 6 South, Range 34 East, Boise Meridian, Bannock County, Idaho, with a Basis of Bearings of the City of Pocatello Datum based on the Central Meridian of the East Zone of the Idaho State Plane Coordinate System, more particularly described as follows:

Commencing at the West Quarter Corner of said Section 1, Township 6 South, Range 34 East, being marked by 1 inch iron rod as shown on Corner Perpetuation and Filing, Instrument No. 20520359;  thence along the Latitudinal Centerline of said Section 1, South 89°54'37" East 1971.46 feet to the point of non-tangency with a 1015.00 foot radius curve concave to the northeast of which radius bears North 00°06'52" East, also being the **Point of Beginning**; thence northwesterly 1099.64 feet along the arc of said 1015.00 foot radius curve to the right through a central angle of 62°04'26" and a long chord that bears North 58°50'55" West 1046.65 feet;  thence North 27°48'42" West 657.76 feet to a point of tangency with a 925.00 foot radius curve concave to the southwest of which radius bears South 62°11'18" West;  thence northwesterly 409.59 feet along the arc of said 925.00 foot radius curve to the left through a central angle of 25°22'14"  and a long chord that bears North 40°29'49" West 406.25 feet to the Easterly line of State of Idaho Highway Right-of-Way deed, Instrument No. 21811260;  thence along said Easterly line, North 36°48'47" East 10.00 feet to a point of non-tangency with a 935.00 foot radius curve concave to the southwest of which radius bears South 36°49'04" West;  thence along the Southerly line of Right-of-Way deed, Instrument No. 21919292, southeasterly 414.02 feet along the arc of said 935.00 foot radius curve to the right through a central angle of 25°22'14" and a long chord that bears South 40°29'49" East 410.64 feet;  thence continuing along said Southerly line, South 27°48'42" East 657.76 feet to a point of tangency with a 1005.00 foot radius curve concave to the northeast of which radius bears North 62°11'18" East;  thence continuing along said Southerly line, southeasterly 1088.83 feet along the arc of said 1005.00 foot radius curve to the left through a central angle of 62°04'31" and a long chord that bears South 58°50'57" East 1036.36 feet to the Westerly line of Right-of-Way deed, Instrument No. 21919290; thence along said Westerly line, South 00°15'27" West 10.00 feet to the **Point of Beginning**.

Parcel contains 0.497 acres, more or less.



1

**EXHIBIT "N"**
**Page 3 of 4**

Instrument: 22008170 Page:0



**Creek Hollow & Associates, Inc.**

611 Wilson Ave., Suite 1A, Pocatello, ID 83201
Phone:  (208) 709-3113 / Fax: (208) 238-8852

**LEGAL DESCRIPTION**
10 foot wide Parcel - North of Northgate Parkway

A parcel of land located in the Northwest Quarter of Section 1, Township 6 South, Range 34 East, Boise Meridian, Bannock County, Idaho, with a Basis of Bearings of the City of Pocatello Datum based on the Central Meridian of the East Zone of the Idaho State Plane Coordinate System, more particularly described as follows:

Commencing at the West Quarter Corner of said Section 1, Township 6 South, Range 34 East, being marked by 1 inch iron rod as shown on Corner Perpetuation and Filing, Instrument No. 20520359;  thence along the Latitudinal Centerline of said Section 1, South 89°54'37" East 1971.46 feet to the Westerly line of Right-of-Way deed, Instrument No. 21919290;  thence along said Westerly line, North 00°15'27" East 140.00 feet to a point of non-tangency with a 875.00 foot radius curve concave to the northeast of which radius bears North 00°05'30" East, also being the **Point of Beginning**;  thence along the Northerly line of Right-of-Way deed, Instrument No. 21919292, northwesterly 948.32 feet along the arc of said 875.00 foot radius curve to the right through a central angle of 62°05'48" and a long chord that bears North 58°51'36" West 902.58 feet; thence continuing along said Northerly line, North 27°48'42" West 657.76 feet to a point of tangency with a 1065.00 foot radius curve concave to the southwest of which radius bears South 62°11'18" West;  thence continuing along said Northerly line, northwesterly 471.59 feet along the arc of said 1065.00 foot radius curve to the left through a central angle of 25°22'16" and a long chord that bears North 40°29'50" West 467.75 feet to the Easterly line of State of Idaho Highway Right-of-Way deed, Instrument No. 21811260;  thence along said Easterly line, North 36°49'47" East 10.00 feet to a point of non-tangency with a 1075.00 foot radius curve concave to the southwest of which radius bears South 36°49'02" West;  thence southeasterly 476.02 feet along the arc of said 1075.00 foot radius curve to the right through a central angle of 25°22'16" and a long chord that bears South 40°29'50" East 472.14 feet;  thence South 27°48'42" East 657.76 feet to a point of tangency with a 865.00 foot radius curve concave to the northeast of which radius bears North 62°11'18" East;  thence southeasterly 937.51 feet along the arc of said 865.00 foot radius curve to the left through a central angle of 62°05'55" and a long chord that bears South 58°51'40" East 892.29 feet;  thence South 89°54'37" East 3.34 feet to a point of tangency with a 100.00 foot radius curve concave to the northwest of which radius bears North 00°05'23" East;  thence northeasterly 70.61 feet along the arc of said 100.00 foot radius curve to the left through a central angle of 40°27'33" and a long chord that bears North 69°51'37" East 69.16 feet to a point of reverse curvature of a 130.00 foot radius curve concave to the south of which radius bears South 40°22'10" East;  thence northeasterly 183.60 feet along the arc of said 130.00 foot radius curve to the right through a central angle of 80°55'05" and a long chord that bears South 89°54'37" East 168.72 feet to a point of reverse curvature of a 100.00 foot radius curve concave to the northeast of which radius bears North 40°32'56" East;  thence southeasterly 70.61 feet along the arc of said 100.00 foot radius curve to the left through a central angle of 40°27'33" and a long chord that bears South 69°40'51" East 69.16 feet;  thence South 00°57'32" West 10.00 feet to a point of non-tangency with 110.00 foot radius curve concave to the northeast of which radius bears North 00°10'07" East;  thence along the Northerly line of Right-of-Way deed, Instrument No. 21919290, northwesterly 77.52 feet along the arc of said 110.00 foot radius curve to the right through a central angle of 40°22'48" and a long chord that bears North 69°38'28" West 75.93 feet to a point of reverse curvature of a 120.00 foot radius curve concave to the south of which radius bears South 40°32'56" West;  thence continuing along said Northerly line, northwesterly 169.47 feet along the arc of said 120.00 foot radius curve to the left through a central angle of 80°55'05" and a long chord that bears North 89°54'37" West 155.74 feet to a point of reverse curvature of a 110.00 foot radius curve concave to the northwest of which radius bears North 40°22'10" West;  thence continuing along said Northerly line, southwesterly 77.68 feet along the arc of said 110.00 foot radius curve to the right through a central angle of 40°27'33" and a long chord that bears South 69°51'37" West 76.07 feet;  thence continuing along said Northerly line, North 89°54'37" West 3.37 feet to the **Point of Beginning**.

Parcel contains 0.551 acres, more or less.

PROFESSIONAL LAND SURVEYOR
REGISTERED
12457
5-1-2020
STATE OF IDAHO
CHRISTOPHER ADAMS

1

**EXHIBIT "N"**
**Page 4 of 4**